365 So.2d 1361 (1978)
STATE of Louisiana
v.
Ramond EAMES.
No. 61699.
Supreme Court of Louisiana.
December 27, 1978.
Concurring Opinion January 19, 1979.
Rehearing Denied January 26, 1979.
Robert C. Williams, R. Judge Eames, Baton Rouge, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., Ralph Roy, Marilyn C. Castle, Asst. Dist. Attys., for plaintiff-appellee.
DIXON, Justice.
Ramond Eames was charged by bill of information for having:

*1362 ". . . violated Louisiana Act Number 176 of 1969 in that you incited a riot which resulted in the deaths of Ralph Hancock and Dwayne Wilder
Second Count: That on the above date set forth, you feloniously violated Louisiana Act Number 176 of 1969 in that you participated in the aforementioned riot which resulted in the deaths of Ralph Hancock and Dwayne Wilder
More specifically, the above violations occurred in that you willfully endeavored and procured your co-defendants and others present to create and participate in a public disturbance involving your co-defendants and others acting together and in concert by urging and procurring (sic) them to take over the city of Baton Rouge by blocking the 1300 block of North Boulevard with parked vehicles and a line of human beings, involving you and your co-defendants, across North Boulevard, thereby creating a confrontation with police authorities and physically attacking said authorities when they attempted to remove said obstruction causing a public disturbance from which the deaths of Ralph Hancock and Dwayne Wilder resulted . . ."
The verdict of the jury was "guilty of attempted participation in a riot which results in death." The jury had been instructed that one of seven responsive verdicts was "guilty of attempted participation in a riot."
In a motion for arrest of judgment, the defendant argued that the verdict was not responsive, or was otherwise so defective that it would not form the basis of a valid judgment. C.Cr.P. 859.
Act 176 of 1969 is a lengthy act which defines several offenses. Some of the act appears at R.S. 14:329.1 through 329.7. The first three sections of the act are as follows:
"Section 1. The Legislature, in recognition of unlawful disorders across the nation which are disruptive of governmental and educational processes and dangerous to the health and safety of persons and damaging to public and private property, establishes by this Act certain criminal penalties and other sanctions for conduct declared in this Act to be unlawful.
Section 2. A. A riot is a public disturbance involving an assemblage of three or more persons acting together or in concert which by tumultuous and violent conduct, or the imminent threat of tumultuous and violent conduct, results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property.
Section 3. Inciting to riot is the endeavor by any person to incite or procure any other person to create or participate in a riot."
Section 4 concerns the command by police to disperse. Section 5 concerns the "wrongful use of property." Section 6 concerns interference with use of educational property and process. Section 7 concerns the proclamation of a state of emergency. Section 8 is the penalty clause:
"Section 8. A. Whoever willfully is the offender or participates in a riot, or is guilty of inciting a riot, or who fails to comply with a lawful command to disperse, or who is guilty of wrongful use of public property, or violates any other provision hereof shall be fined not more than five hundred dollars or be imprisoned not more than six months, or both.
B. Where as a result of any willful violation of the provisions of this Act there is any serious bodily injury or any property damage in excess of five thousand dollars, such offender shall be imprisoned at hard labor for not more than five years.
C. Where, as a result of any willful violation of the provisions of this Act, the death of any person occurs, such offender shall be imprisoned at hard labor for not to exceed twenty-one years."
The jury was instructed that it could render one of seven verdicts, as follows:
"1. Guilty of inciting or participating in a riot which results in death.
2. Guilty of attempted participation in a riot which results in death.

*1363 3. Guilty of inciting or participating in a riot which resulted in serious bodily harm.
4. Guilty of attempted participation in a riot which resulted in serious bodily harm.
5. Guilty of inciting or participating in a riot.
6. Guilty of attempted participation in a riot.
7. Not guilty."
The verdict of the jury was not divided as to counts, nor was the jury instructed to find a verdict on both the counts in the bill of information. Count one of the bill of information was simply a charge that defendant incited a riot which resulted in deaths of two people. The second count, as noted above, accuses the defendant of having "participated in the aforementioned riot," but is qualified by the detailed "more specifically" clause. "More specifically," the defendant is charged with having endeavored to procure others to create and participate in a disturbance by acting together, and urging and procuring them to take over the city by blocking the street, thereby creating a confrontation and attacking the authorities, causing a public disturbance.
That portion of Act 176 of 1969 dealing with riots was carried over into the revised statutes as follows: Section 2 of Act 176 became 14:329.1; Section 3, 14:329.2; Section 8, 14:329.7. These sections probably condemn two separate offenses, as relevant here. R.S. 14:329.2 defines "inciting to riot." The penalty provision punishes not only one "guilty of inciting to riot," but one who "participates in a riot." It is highly likely that the legislature intended to punish two separate offenses (as here relevant); one inciting to riot; the other, participating in a riot. If only one offense was intended, it was the one defined: inciting to riot.
"Counts are charges of crime joined in the same indictment. Recitals in one count may be incorporated in subsequent counts by means of a clear and distinct reference. . . ." C.Cr.P. 490.
Charged here is an offense on January 10, 1972; the bill of information was filed December 7, 1973. Therefore, Act 528 of 1975, repealing articles 491 and 492 of the Code of Criminal Procedure, relating to duplicity, and amending C.Cr.P. 493 to permit the joinder of offenses in separate counts is not applicable. At all times relevant to this case then, a bill could charge only one offense, but the same offense could be charged in different ways in several counts. C.Cr.P. 493, before the amendment by Act 528 of 1975.
In spite of the fact that the second count of the indictment announces that defendant is accused of participating in a riot, the detailed specifications charge him only with willfully endeavoring to procure others to do the acts described. Inciting to riot is defined, as noted above, as the "endeavor by any person to incite or procure any other person to create or participate in a riot." The question, then, is whether there can be an attempt to incite a riot.
An attempt is an inchoate offense. The crime of attempt is designed to punish certain activity which was not completed incipient criminal activity. It depends for its existence on a "specific intent to commit a crime." R.S. 14:27. If the definition of another crime includes the attempt to do something, the attempt statute, R.S. 14:27, cannot be employed, for then a defendant would be charged with an attempt to attempt to do an illegal act. The reporter's comment to R.S. 14:27 makes this clear:
"This section is in accord with the general common law concept of attempt. An attempt to commit any crime is an offense, whether the offense attempted be a felony or merely a misdemeanor. Clark and Marshall, Law of Crimes (4th ed. 1940) 153, § 113. Since there can be no such thing as an attempt to commit an attempt, there can be no attempt to commit either an aggravated assault or a simple assault. Those offenses are themselves in the nature of attempts to commit a battery. See Clark and Marshall, supra, 156, § 114(d)."
See also 28 La.L.Rev. 543, 544 (1968), footnote 115:

*1364 "There is no such thing as attempted conspiracy. The courts refuse to apply the principle of the inchoate crime of attempt to other inchoate crimes. Note, 9 La.L.Rev. 413 (1949)."
9 La.L.Rev. 413 was a case note on State ex rel. Clarence Duhon v. General Manager, Louisiana State Penitentiary, No. 39,091, July 20, 1948, in which this court approved without discussion the release on a writ of habeas corpus of one who had been convicted of attempted conspiracy without having filed a motion in arrest of judgment or having taken an appeal.
Since the bill could charge only one offense, and particularized the offense of inciting to riot, and since inciting to riot, as defined in the statute, is an inchoate offense, the verdict returned was not responsive, as there can be no attempt to incite, and inciting to riot was the only crime charged.
The conviction and sentence are reversed, and the defendant is discharged.
DENNIS, J., concurs in the decree and assigns reasons.
SUMMERS and MARCUS, JJ., dissent.
SANDERS, C. J., dissents and assigns reasons.
DENNIS, Justice, with whom TATE and CALOGERO, JJ., join, assigns additional concurring reasons:
In addition to the reasons given in the majority opinion, the defendant's conviction and sentence must be reversed because he was denied the rights to a fair and impartial jury guaranteed by the federal and state constitutions.
This criminal appeal raises the question of whether a black defendant, charged with inciting to riot during a Black Muslim street demonstration, was denied his rights to individual dignity and equal protection of the laws guaranteed by the Louisiana Constitution when the prosecuting attorney admittedly used the State's peremptory challenges to remove blacks from the petit jury because he believed the fact of their race indicated they were likely to be partial due to their susceptibility of intimidation by radical elements of the black community.
This prosecution is one of the Baton Rouge "Black Muslim cases," as denominated in defendant's brief and in popular parlance. See, State v. Bell, 315 So.2d 307 (La.1975), 346 So.2d 1090 (La.1977); State v. Williams, 354 So.2d 562 (La.1978). The cases arose from a riot which erupted January 10, 1972 on a public street in Baton Rouge when police officers attempted to remove parked cars and disperse Black Muslim demonstrators blocking the thoroughfare. Five men were killedtwo white deputy sheriffs and three of the black demonstrators; one white television reporter was severely beaten sometime before the riot and remains unconscious to this date.
Defendant, Ramond Eames, was one of the black persons at the scene of the violent public disorder. He was arrested and charged by bill of information with inciting or participating in a riot in which the death of a person had occurred. La.R.S. 14:329.1-329.8. After a trial by a twelve-person jury on February 19-24, 1974, the defendant was convicted of attempting to participate in a riot in which the death of a person had occurred and sentenced to serve nine years in prison at hard labor. Although the trial occurred over two years after the riot, racial tension was still present in the community, as evinced by the responses of many veniremen during voir dire and the prosecutor's attempts to remove blacks from the jury.
After the trial the defendant filed a motion in arrest of judgment and a motion for a new trial based on his timely objections to the State's exclusion of black persons from the petit jury by use of its peremptory challenges, and on the ground that, considering all circumstances, the ends of justice would be served by a new trial.
During the voir dire the State used a disproportionate number of its peremptory *1365 challenges to exclude blacks from the jury.[1] One black juror was selected after exhaustion of the State's peremptories. The mere fact that one black juror was selected does not prevent defendant from attempting to show a denial of due process or equal protection. State v. Bias, 354 So.2d 1330 (La. 1978); State v. Bastida, 310 So.2d 629 (La. 1975).
In support of defendant's contention that he had been denied due process and equal protection of the laws under the United States Constitution and the Louisiana Constitutions of 1921 and 1974, the defendant attempted to show that systematic exclusion of black jurors had been practiced by the prosecuting attorney for several years. The only evidence offered by the defendant was the testimony of a court reporter who had kept partial records of the race of jurors peremptorily challenged in one division of the district court for three years. During the hearing and argument on the motions, however, the prosecuting attorney candidly admitted that he had not wanted blacks on the jury in the instant case and indicated that he had excluded them because he believed that any black juror would have been susceptible to intimidation by black radicals in the community.
At the conclusion of the hearing on the motion, the trial judge overruled the motion, finding that the defendant had failed to prove systematic exclusion of blacks from petit juries by the State over a period of time, and commenting that the trial court was barred from otherwise inquiring into the prosecutor's peremptory challenges by the decision of the Supreme Court in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). The defendant assigned this ruling as error and contends that the prosecuting attorney committed acts of racial discrimination prohibited by both state and federal constitutions when he used all of the State's peremptory challenges to remove blacks from the jury.
Under this showing, in my opinion the defendant is entitled to a new trial under La.C.Cr.P. art. 851(5):
"The court, on motion of the defendant shall grant a new trial whenever:
"* * *
"(5) the court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right." (emphasis added)
My opinion is based upon the peculiar combination of factual and legal circumstances of this case, which show: (a) The prosecuting attorney admitted that jurors were peremptorily challenged because of race; (b) If the case had been tried after the effective date of the 1974 Louisiana Constitution, the prosecutor's admission would have established a clear denial of equal protection of laws under the state constitution; (c) The prosecutor's admission does establish a probable denial of equal protection of laws under the Fourteenth Amendment; (d) Although the case was tried on February 19-24, 1974, the hearing on the motion for a new trial was not held until January 19 and March 22, 1977, well after the effective date of the 1974 Louisiana Constitution; (e) In cases such as the present case, in which racial tensions were high, the removal of all but one member of defendant's race from the jury is inconsistent with the guarantee of a fair and impartial trial which both the prosecution and the court are sworn to uphold.
Although La.C.Cr.P. art. 858 provides that neither the appellate nor supervisory jurisdiction of this Court may be invoked to review the granting or the refusal to grant a new trial, except for error of law, an abuse of the trial judge's discretion in determining whether the ends of justice would be served by granting a new trial presents a question of law. State v. Randolph, 275 So.2d 174 (La.1973). Of course, *1366 great weight must be attached to an exercise of the trial court's discretion, which should not be disturbed on review in the absence of a clear abuse. See, e. g., State v. Jackson, 253 La. 205, 217 So.2d 372 (1968); State v. Truax, 222 La. 463, 62 So.2d 643 (1952). Nevertheless, in view of the showing made, the denial of a new trial in the present case amounted to a clear abuse of discretion.
The trial judge's reliance upon Swain v. Alabama as precedent for his refusal to inquire into the issue raised by the State's acknowledged use of peremptory challenges to remove black citizens from the jury calls for a thorough reexamination of that case. In the Swain case, the defendant, a nineteen-year-old Negro charged with the rape of a seventeen-year-old white girl, was convicted by an all-white jury in Talladega County, Alabama, and sentenced to death. Although the county's population was twenty-six percent black, and ten to fifteen percent of the jury venires was black, no Negro had actually served on a petit jury for fifteen years. The absence of blacks from trial juries was attributable to the operation of the Alabama struck jury system, a variant of the peremptory challenge system, in which veniremen remaining after excuses, exemptions, removals for cause are "struck"the defense striking two and the prosecutor striking one alternatively until only twelve jurors are left. In the Swain case there were eight blacks on the venire; two were exempt, and the prosecution struck the rest. Swain contended that he had been denied equal protection of the laws by racially discriminatory selection of the jury venire and the petit jury. Swain argued that discrimination was accomplished by use of the State's peremptory strikes in the particular case to remove all black veniremen; and by use of the peremptory strike system through the years in a scheme to exclude all blacks.
The Supreme Court rejected Swain's contentions and affirmed the judgment of conviction. As I read the opinion of the Court, although it is subject to differing interpretations, the decision was based on several interrelated reasons. The underlying rationale appears to be that the equal protection clause of the Fourteenth Amendment does not prohibit a state prosecutor from peremptorily challenging a venireman because of his race if the fact of his race in that particular case would lead in good faith to the conclusion that the juror is likely to be partial. In order to protect the efficacy of the peremptory challenge, and to prevent the disruption of trials by defendants' continual charges of prosecutorial abuse, the Court created a presumption that in any particular case the prosecutor has invoked the state's peremptories because of good faith trial-related considerations. The Court stated that the presumption is not destroyed by the mere fact that in the case at hand all blacks were removed from the jury. Perhaps the defendant by proof of a state's systematic striking over a period of time of blacks in the selection of petit juries, or by eliciting an admission from the prosecutor that discrimination accounted for his rejection of blacks, may raise a prima facie case under the Fourteenth Amendment.[2] However, in Swain there was no admission by the prosecution and the Court thought that the record in the case was not sufficient to demonstrate systematic exclusion.
The Court refused to apply the rule developed in a long line of cases involving racial exclusion from jury venires, e. g., Norris v. Alabama;[3]Patton v. Mississippi;[4] *1367 and Arnold v. North Carolina,[5] which provides that proof of total or virtual exclusion of a class from jury service, coupled with a showing that qualified members of that class resided within the community, makes out a prima facie case of discrimination, which the State must rebut with evidence that the exclusion is not the result of state discrimination. Because this rule had evolved in cases dealing with the selection of jury venires, which is wholly in the hands of state officials, the Court concluded that it could not be invoked by Swain to contest the selection of the petit jury unless it was shown that the prosecutor, as well as defendants' lawyers, participated over a period of time in causing the total exclusion by his peremptory challenges.[6] The opinion of the Court in Swain v. Alabama has been critically assayed from a number of standpoints.[7] The most fundamental objection is that the Court, by placing the state's peremptory challenge beyond realistic scrutiny, converted the challenge from a device for protecting defendants into a tool for restricting the availability of the defendant's constitutional right to equal protection of the law in jury selection.[8] The state's use of peremptory challenges to totally exclude blacks from petit juries would seem to present a classic prima facie case of racial discrimination. The majority opinion in Swain, however, refused to acknowledge the natural inference to be drawn from these facts, and instead saddled the defendant with an impossible burden.[9]
The Swain decision has also been criticized for its questionable historical analysis of the nature and purpose of the peremptory challenge, from which the Court inferred that the prosecutor's use of the challenge should be given the same protection as it receives in the defendant's hands.[10] This view is not only historically suspect. Arguably, it also ignores constitutional rights of the accused which could be imperiled by the state's use of peremptory challenges. The Court apparently believed that exclusion of black jurors would not prevent a trial by a fair and impartial jury because they could be replaced by impartial white jurors. However, in cases such as Swain and the present case, where racial tensions are high, an excluded black juror is more likely to be replaced by a hostile white juror.[11]
Since the Swain decision, defendants have objected frequently to prosecutors' removal of blacks from trial juries by peremptory challenges, but the Supreme Court's "systematic exclusion" test, according *1368 to our research, has never been met by a defendant in a reported decision.[12]
Although this Court in the past has followed Swain, recent opinions have expressed concern over the continuing claims of racial exclusion in the selection of East Baton Rouge Parish juries.[13] The instant appeal indicates that past warnings against an obsolete prosecutorial attitude have gone unheeded.[14] It is also the first case in which this Court has considered a charge of peremptory abuse based upon the Louisiana Constitution of 1974.[15] Although the instant case was tried before the effective date of the 1974 Louisiana Constitution, the requirements of its new equal protection clause should be considered in determining whether the ends of justice would be served by the granting of a new trial. La.C.Cr.P. art. 851(5). Accordingly, this is an appropriate occasion to consider to what extent the 1974 state constitutional guarantee of individual dignity provides protection against racial discrimination in the selection of a petit jury.
Since the state's peremptory challenge is not a federally protected right,[16] Louisiana is free to afford its citizens greater protection against invidious peremptory challenges than the minimum required of a state by the Fourteenth Amendment as interpreted by the Supreme Court in Swain. In its present constitution, and in all previous state charters beginning with the constitution of 1879,[17] Louisiana has chosen not to guarantee peremptory challenges to the prosecution,[18] while assuring criminal defendants the right to challenge jurors peremptorily.[19] The questions raised by defendant's assignment of error under the 1974 Louisiana Constitution, therefore, are (1) whether the State of Louisiana provides any greater protection against racial discrimination by the State in the selection of petit juries than that provided by the Fourteenth Amendment and (2) what evidentiary burden must the defendant sustain in order to have a petit jury panel set aside as having been selected through official discrimination on the basis of race?
The answer to the first question is clear. Article I, § 3 of the 1974 Louisiana Constitution absolutely prohibits state action which discriminates against a person because of race or religion.[20] The use of the *1369 Fourteenth Amendment language and the remarks by the Louisiana constitutional convention delegates indicate that our concept of "state action" is at least as broad as that which has evolved in federal court decisions.[21] Accordingly, it is clear that the convention intended to prohibit racial discrimination by the state's executive officers, such as the district attorneys, as well as by legislative action. See Mooney v. Holohan, 294 U.S. 103, 112-13, 55 S.Ct. 340, 342, 79 L.Ed. 791, 794 (1935) ("the action of prosecuting officers on behalf of the state. . . may constitute state action within the purview of the Fourteenth Amendment"); Carter v. Texas, 177 U.S. 442, 447, 20 S.Ct. 687, 689, 44 L.Ed. 417, 419 (1900) (the Fourteenth Amendment governs any state action "whether through its legislature, through its courts, or through its executive or administrative officers"). See also, Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1907). However, by absolutely prohibiting racially discriminatory state action, our state declaration of the right to individual dignity goes beyond the decisional law construing the Fourteenth Amendment to the United States Constitution.[22] The Fourteenth Amendment as interpreted in Swain, apparently allows a prosecutor to exclude a venireman peremptorily because of his race if it is based on "trial-related considerations." Our state charter, on the other hand, while allowing reasonable discrimination because of other characteristics, permits none because of race or religion, even though the discrimination may be reasonably related to a legitimate state objective such as a criminal prosecution.[23]
This Court is required by its duty to support the constitution of this State to adopt evidentiary rules which will promote the enforcement of the individual liberties guaranteed by the constitution.[24] Practical experience and academic thought since the Swain decision indicate that the burden of proof adopted therein is too heavy to allow a defendant to enforce his right to equal protection except in the rarest of cases. Moreover, since the Louisiana equal protection standard absolutely prohibits a prosecutor from practicing trial-related racial discrimination, the presumption that "the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the Court" is not justified if substantial evidence in the particular case on trial indicates exclusion of jurors because of race. The Louisiana Constitution's guarantee of individual dignity is a command, rather than a homily, specifically prohibiting any form of state discrimination because of race. It is an earnest attempt *1370 by the framers and the citizens to fulfill one of the primary purposes for which the constitution was ordained and established"to. . . assure equality of rights." La. Const.1974, Preamble. No less is required of this Court than that it should assure the actual fulfillment of the constitutional purpose and the guarantee by a realistic evidentiary standard.
A presumption should exist during the selection of a jury that individual peremptory challenges by the prosecution are being properly used. Once it becomes evident, however, that the prosecution has used a disproportionate number of challenges against members of one race, or has eliminated a disproportionate number of members of a certain race, considering the proportionate number of that race included within the venire after excuses, exemptions and removals for cause, in my opinion, a prima facie case of discrimination because of race has been established, and the burden of proof should shift to the prosecutor to show that his challenges were not exercised on the basis of race. The State may sustain its burden by offering evidence that its reasons for individual challenges were not because of race. Although the reasons need not be sufficient to ground a challenge for cause, they should appear to have been applied consistently to similarly situated jurors of other groups, and they should be reasonably relevant to the particular trial or to non-racial characteristics. If the trial court determines that the jury has been improperly selected, it should discharge the jury and select a new one according to constitutional procedures.
Applying these rules to the record in this case, it is clear that the defendant made a prima facie showing that the prosecutor had exercised peremptory challenges against black jurors because of their race. The trial court, therefore, erred in deciding that the prosecutor was not required to respond to the defendant's allegation, and in denying defendant's motions without a rebuttal showing by the prosecutor that the challenges were each predicated on nonracial grounds.
The California Supreme Court, in its recent decision in People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), reached a similar conclusion for different reasons. Rejecting Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) as precedent in interpreting the California constitution's guarantee of trial by an impartial jury drawn from a representative cross-section of the community, the Court held that peremptory challenges to remove prospective jurors on the sole ground of "group bias" violates the constitutional safeguard. Finding that the prosecutor's peremptory challenges of all prospective black jurors established a prima facie showing that the challenges were exercised against black jurors on the basis of "group bias" alone, and that the prosecutor had offered no rebuttal, the California court reversed the defendants' convictions.
Crucial to the California Supreme Court's decision in Wheeler is its conclusion that under the California constitution a party is entitled to a petit jury that is as near an approximation of the ideal cross-section of the community as the process of random draw permits. Accordingly, the Court reasoned that if the essential quality of representativeness were to be preserved, prospective jurors could be subjected to challenges for cause and peremptory challenges on grounds of "specific bias," but that it could not "countenance the decimation of the surviving jurors by peremptory challenges on the ground of group bias alone." 148 Cal. Rptr. 903, 583 P.2d 762. The Court explained the difference between "group bias" and "specific bias" as follows:
"The purpose of the challenges also dictates their scope: they are to be used to remove jurors who are believed to entertain a specific bias, and no others.
* * * * * *
"* * *
"For example, a prosecutor may fear bias on the part of one juror because he has a record of prior arrests or has complained of police harassment, and on the part of another simply because his clothes or hair length suggest an unconventional *1371 lifestyle. In turn, a defendant may suspect prejudice on the part of one juror because he has been the victim of crime or has relatives in law enforcement, and on the part of another merely because his answers on voir dire evince an excessive respect for authority. Indeed, even less tangible evidence of potential bias may bring forth a peremptory challenge: either party may feel a mistrust of a juror's objectivity on no more than the `sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another' (4 Blackstone, Commentaries * 353)upon entering the box the juror may have smiled at the defendant, for instance, or glared at him. Responsive to this reality, the law allows removal of a biased juror by a challenge for which no reason `need be given,' i. e., publicly stated: in many instances the party either cannot establish his reason by normal methods of proof or cannot do so without causing embarrassment to the challenged venireman and resentment among the remaining jurors.
"All of these reasons, nevertheless, share a common element: they seek to eliminate a specific bias as we have defined that term hereina bias relating to the particular case on trial or the parties or witnesses thereto. By the same token, they are essentially neutral with respect to the various groups represented on the venire: the characteristics on which they focus cut across many segments of our society. Thus both blacks and whites may have prior arrest, both rich and poor may have been crime victims, both young and old may have relatives on the police force, both men and women may believe strongly in law and order, and members of any group whatever may alienate a party by `bare looks and gestures.' It follows that peremptory challenges predicated on such reasons do not significantly skew the population mix of the venire in one direction or another; rather, they promote the impartiality of the jury without destroying its representativeness.
"By contrast, when a party presumes that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar groundswe may call this `group bias'and peremptorily strikes all such persons for that reason alone, he not only upsets the demographic balance of the venire but frustrates the primary purpose of the representative cross-section requirement. That purpose, as we have seen, is to achieve an overall impartiality by allowing the interaction of the diverse beliefs and values the jurors bring from their group experiences. Manifestly if jurors are struck simply because they may hold those very beliefs, such interaction becomes impossible and the jury will be dominated by the conscious or unconscious prejudices of the majority. Seen in this light, the presumed group bias that triggered the peremptory challenges against its members is indistinguishable from the group perspective we seek to encourage by the cross-section rule.[17]
"* * *
[17] "As a recent commentator aptly put the point in the context of the case at bar, `It may be argued that the exclusion of jurors on the basis of group membership would be acceptable where it is believed that, for example, blacks are consistently more biased in favor of acquittal than whites. The argument misses the point of the right to an impartial jury under Taylor [Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690]. Blacks may, in fact, be more inclined to acquit than whites. The tendency might stem from many factors, including sympathy for the economic or social circumstances of the defendant, a feeling that criminal sanctions are frequently too harshly applied, or simply an understandable suspicion of the operations of government. Whites may also be more inclined to convict, particularly of crimes against a white victim. But these tendencies do not stem from individual biases related to the peculiar facts or the particular party at trial, but from differing attitudes toward the administration of justice and the nature of criminal offenses. The representation on juries of these differences in juror attitudes is precisely what the representative cross-section standard elaborated in Taylor is designed to foster.' (Note, Limiting the Peremptory Challenge: Representation of Groups on Petit Juries (1977) 86 Yale L.J. 1715, 1733, fn. 77.)"
"* * *
*1372 Although I do not disagree with the California Supreme Court's analysis, it is not necessary at this time that this Court fashion so broad a rule, i. e., a rule prohibiting peremptory challenges by either the State or the defendant which remove jurors on the sole ground of a cognizable group's presumed bias. Because of the 1974 Louisiana Constitution's explicit, absolute ban against discrimination because of race, we need not rely on the impartial jury guarantee or its attendant representative cross-section rule. It is sufficient to curb the prosecutorial practice of exercising peremptory challenges against jurors because of race that we enforce our constitution's absolute guarantee of equal protection of the law for all races. We need not consider at this time, as California has, whether the broad guarantee of a jury drawn from a representative cross-section prohibits peremptory challenges based on any presumed "group bias."
Moreover, even if the prohibition of discrimination against persons because of race contained in the 1974 Louisiana Constitution were to be disregarded, the same result should nevertheless be reached in the instant case under the Swain interpretation of the Fourteenth Amendment. As I read Swain, an admission by the prosecutor that he employed peremptory challenges to exclude blacks regardless of trial considerations in the particular case will suffice to raise a prima facie case under the Fourteenth Amendment. This is a logical construction of Swain because the Swain barrier allowing only indirect proof of racial discrimination by evidence of systematic exclusion is justifiable only as a means of protecting the state's use of peremptories and of preventing trial disruption. In the rare case in which the prosecutor admits to racial exclusion of jurors without legitimate trial-related grounds there is no reason for the defendant to seek a hearing to inquire further into the prosecutor's motives. Conclusive proof of denial of equal protection is established by the prosecutor's unrecanted admission.
In the instant case the prosecuting attorney did not deny that blacks were excluded from the petit jury. He attempted to justify this action without evidence by arguing that it was necessary to exclude blacks in order to obtain a fair and impartial jury free from outside pressure. However, our review of the transcript of the voir dire reflects that he made no attempt whatsoever to determine whether potential black jurors might be susceptible to intimidation. Although careful voir dire examination and individualized peremptory challenges of persons who seemed easily susceptible to intimidation may have been justified, in the absence of convincing proof I am unwilling to believe that the blanket exclusion of all black persons was necessary as a reasonable precaution against the danger with which the prosecutor was concerned. It does not appear likely that all prospective black jurors would have been either subjected or susceptible to intimidation. Furthermore, an all-white jury could also threaten the goal of a fair and impartial trial. If radical elements were active in the community, it is possible that a substantial number of prospective white jurors would have been easy targets for intimidation as well. Also, in an atmosphere of racial strife, such as that which surrounded this trial, there is a significant possibility that any white juror who replaced a challenged black venireman would harbor some degree of hostility toward the black defendant. For these reasons I conclude that the prosecuting attorney's use of peremptory challenges in an attempt to exclude all black persons from the jury cannot be justified even under the Swain rule as a good faith effort to remove persons from the jury who are likely to be partial.
Although I join in the majority opinion, I think this Court also should address itself to the serious violations of both the federal and the state constitutions manifested in the exclusion of black citizens from the jury by the State's peremptory challengesnot only because Ramond Eames, a black man probably was denied an impartial jury in his trial for a crime involving the killing of two white police officers in an atmosphere of racial strife, but also because other prosecuting attorneys perhaps still labor under *1373 the misapprehension that jurors may be peremptorily challenged on the basis of race. In order to dispel any false impression and avoid the needless reversal of future convictions, the stringency of the 1974 Louisiana Constitution's prohibition against racially discriminatory State action should be expounded upon by this Court. The injury in this case was not limited to the defendantthere also was injury to the jury system, to the law as an institution, to the community in which the trial was held, and to the democratic ideal reflected in our state constitution and in the processes of our courts.
SANDERS, Chief Justice (dissenting).
The majority correctly recognizes that the Legislature proscribed two separate and distinct crimes in LSA-R.S. 14:329.1 and 14:329.2: participating in a riot and inciting to riot. The majority, however, holds that attempted inciting to riot is an unresponsive verdict. This conclusion is inconsequential as the jury returned a verdict of attempted participation in a riot.
Further, in my opinion, attempted participation in a riot is a responsive verdict. Louisiana Code of Criminal Procedure Article 814 does not contain the responsive verdicts for a charge of participating in a riot. Its Official Revision Comment (b) states:
"R.S. 14:27 merely defines what constitutes an attempt. Therefore the above article does not conflict with R.S. 14:27; it merely omits some attempts as responsive. For all other offenses not enumerated and listed in the above article attempt would be responsive." [Emphasis supplied.]
Article 815 states that for offenses not provided for in Article 814, guilty, guilty of a lesser and included grade of the offense, and not guilty are responsive verdicts.
An attempt is a separate but lesser grade of the intended crime. LSA-R.S. 14:27C provides:
"An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt."
Clearly, therefore, attempted participation in a riot is a responsive verdict to participation in a riot.
For the reasons assigned, I respectfully dissent.
NOTES
[1] The record reflects that the State used at least six of its twelve peremptory challenges to exclude blacks. Based on his recollection at the time of the hearing on the motions, the trial judge agreed with the defendant's contentions that all or substantially all of the State's peremptories were used to remove blacks from the jury.
[2] "* * * This is not to say that a defendant attacking the prosecutor's use of peremptory challenges over a period of time need elicit an admission from the prosecutor that discrimination accounted for his rejection of Negroes, any more than a defendant attacking jury selection need obtain such an admission from the jury commissioners. But the defendant must, to pose the issue, show the prosecutor's systematic use of peremptory challenges against Negroes over a period of time. * * *" Swain v. Alabama, 380 U.S. 202, 227, 85 S.Ct. 824, 839, 13 L.Ed.2d 759, 776 (1965).
[3] 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1925).
[4] 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947).
[5] 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964).
[6] The dissent argues, however, that the Court's reasoning "overlooks the fact that the total exclusion of Negroes from juries in Talladega County results from the interlocking of an inadequate venire selection system, for which the State concededly is responsible, and the use of peremptory challenges." 380 U.S. at 241, 85 S.Ct. 824, 847 (Goldberg, J., dissenting).
[7] See, Kuhn, Jury Discrimination: The Next Phase, 41 So.Cal.L.Rev. 235 (1968); Mishkin, The Supreme Court, 1964 Term, 79 Harv.L.Rev. 56 (1965); Comment, Swain v. Alabama: A Constitutional Blueprint for the Perpetuation of the All-White Jury, 52 Va.L.Rev. 1157 (1966); Note, 75 Yale L.J. 322 (1965); See also, Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (Goldberg, J., dissenting).
[8] See, Barham, The Peremptory Challenge: A Prosecutorial Strategem to Circumvent Due Process, 1 So.L.Rev. 16, 24 (1975); Kuhn, Jury Discrimination: The Next Phase, 41 So.Cal.L. Rev. 235, 288 (1968); Comment, Swain v. Alabama: A Constitutional Blueprint for the Perpetuation of the All-White Jury, 52 Va.L.Rev. 1157 (1966). See also, Swain v. Alabama, 380 U.S. 202, 244, 85 S.Ct. 824, 849, 13 L.Ed.2d 759, 786 (1965) (Goldberg, J., dissenting).
[9] See, Kuhn, Jury Discrimination: The Next Phase, 41 So.Cal.L.Rev. 235, 301 (1968); Mishkin, The Supreme Court, 1964 Term, 79 Harv.L. Rev. 56, 137 (1965); Comment, Swain v. Alabama: A Constitutional Blueprint for the Perpetuation of the All-White Jury, 52 Va.L.Rev. 1157 (1966).
[10] See, Comment, Swain v. Alabama: A Constitutional Blueprint for the Perpetuation of the All-White Jury, 52 Va.L.Rev. 1157, 1170-73 (1966). Cf. Swain v. Alabama, 380 U.S. 202, 244-45, 85 S.Ct. 824, 13 L.Ed.2d 759, 785-86 (1965) (Goldberg, J., dissenting).
[11] See, Barham, The Peremptory Challenge: A Prosecutorial Strategem to Circumvent Due Process, 1 So.L.Rev. 16, 26 (1975); Kuhn, Jury Discrimination: The Next Phase, 41 So.Cal.L. Rev. 235, 290-95 (1966).
[12] See Annot., Use of Peremptory Challenge to Exclude from Jury Persons Belonging to a Class or Race, 79 A.L.R.3d 14, 56-73 (1975). But see, People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), discussed infra; United States v. McDaniels, 379 F.Supp. 1243 (E.D.La.1974), in which the defendant was granted a new trial in the interest of justice because the government had peremptorily challenged six black jurors despite defendant's failure to prove a prima facie case of systematic exclusion. See also, California v. Smith, No. 42219 (Alameda County Super.Ct.1968), an unreported case in which a trial court apparently refused to follow Swain and granted a mistrial because the state used racial peremptories in the case on trial. See, A. Ginger, Jury Selection in Criminal Trials, 518 (1975).
[13] State v. Haynes, 339 So.2d 328 (La. 1976); see, State v. Reed, 324 So.2d 373 (La. 1976); State v. Curry, 319 So.2d 917 (La.1975); State v. Carter, 301 So.2d 612 (La.1974); State v. Veal, 296 So.2d 262 (La.1974); State v. Melton, 296 So.2d 280 (La.1974); State v. McAllister, 285 So.2d 197 (La.1973); State v. Smith, 263 La. 75, 267 So.2d 200 (1972).
[14] State v. Haynes, 339 So.2d 328 (La.1976) (Dennis, J., and Tate, J., concurring); State v. Gray, 285 So.2d 199 (La.1973).
[15] Although State v. Kelly, 362 So.2d 1071 (La. 1978) No. 60,914; State v. Bias, 354 So.2d 1330 (La.1978); State v. Rhodes, 351 So.2d 103 (La. 1977); and State v. Sheppard, 350 So.2d 615 (La.1977), were tried after the effective date of the 1974 Louisiana Constitution, our opinions indicate that this state constitutional issue was not raised.
[16] Stilson v. United States, 250 U.S. 583, 40 S.Ct. 28, 63 L.Ed. 1154 (1919).
[17] La.Const. art. I, § 17; La.Const. art. I, § 10 (1921); La.Const. art. X (1913); La.Const. art. X (1898); La.Const. art. VIII (1879).
[18] Barham, The Peremptory Challenge: A Prosecutorial Strategem to Circumvent Due Process, 1 So.L.Rev. 16, 19 (1975).
[19] La.Const. art. I, § 17.
[20] La.Const. art. I, § 3 provides:

"No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime."
[21] Id; State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts Aug. 29, 1973, at 57-77, 80-99; Aug. 30, 1973 at 2-6.
[22] State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts Aug. 30, 1973, at 3:

"The authors believe that there is absolutely no basis for any discrimination of any sort on the basis of, on account of race or religion, but they do believe that there can be discrimination if it is not arbitrary, not capricious, and not unreasonable as far as the other items contained in the original committee report are concerned.
"The next clause provides that there shall be no discrimination against a person, no discrimination of any sort, on account of `race, or religious ideas, beliefs or affiliations.'"
See also, Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L. Rev. 1, 6-10 (1974); Jenkins, The Declaration of Rights, 21 Loy.L.Rev. 9, 17-18 (1975).
[23] Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. at 8 (1974): "[T]he provision does not allow the traditional analysis with respect to race or religion. The second sentence (which uses absolute language) . . . permits no discrimination whatsoever with respect to race or religion."
[24] This Court has routinely adopted evidentiary burden rules for the implementation of constitutional and statutory rights. E. g., State v. Franklin, 353 So.2d 1315 (1978); State v. Ragsdale, 249 La. 420, 187 So.2d 427 (1966). The adoption of the Swain systematic exclusion formula for determining when peremptory challenges were violative of the 1921 Louisiana Constitution was itself a jurisprudential establishment of an evidentiary burden rule.