351 So.2d 771 (1977)
STATE of Louisiana
v.
Rita DAVIS and Gail D. Smith.
No. 59637.
Supreme Court of Louisiana.
October 10, 1977.
Rehearing Denied November 11, 1977.
James E. Boren, Boren & Holthaus, Baton Rouge, for defendants-appellants.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., Anthony J. Marabella, Jr., Marilyn C. Castle, Asst. Dist. Attys., for plaintiff-appellee.
SANDERS, Chief Justice.
Defendants, Rita Davis and Gail D. Smith, were convicted and sentenced in the district court for the armed robbery of a gasoline service station in East Baton Rouge Parish, a violation of LSA-R.S. 14:64. On appeal, defendants rely upon five specifications of error for reversal of their convictions and sentences. Finding merit in defendants' Specification of Error No. 1, we reverse the conviction.
In Specification of Error No. 1, defendants complain that "[t]he trial court erred in admitting testimony over defense objections regarding the fact that a lie detector *772 test was administered to the State's chief witness, Belvin Sanders, and the trial court erred in allowing the State to establish through testimony that Belvin Sanders passed the lie detector test."
It is well settled in our state, as well as in many other jurisdictions, that the fact that a lie detector test was given and the results of such a test are inadmissible in a criminal prosecution. The circumstance that a party was willing or unwilling to take the test or that a test was given is inadmissible because it is viewed as an attempt by indirection to evade the direct prohibition against lie detection testimony. State v. Governor, La., 331 So.2d 443 (1976); State v. Corbin, La., 285 So.2d 234 (1973); State v. Refuge, 264 La. 135, 270 So.2d 842 (1972); McCormick on Evidence, § 207 (2d ed. 1972) Annotation, Physiological or Psychological Truth and Deception Tests, 23 A.L.R.2d 1306 (1952) and supplement; 22A C.J.S. Criminal Law § 645(2); 32 C.J.S. Evidence § 588(4); 29 Am.Jur.2d, Evidence § 831; Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie Detection, 70 Yale L.J. 694, 724-28 (1961).
Although it is settled that reference to the fact that a lie detector test was given, as well as the results, is inadmissible, we have held that such a reference does not always constitute reversible error. State v. Refuge, supra. For this reason, we find it necessary to explain in considerable detail our holding of reversible error under the circumstances of this case.
The State's chief witness, Belvin Sanders, was the attendant on duty at the service station when the alleged armed robbery occurred. She testified that about 11:00 p. m., on July 14, 1976, two women entered the station, produced a gun, took her money, and ran away. Further, she testified that at the time of the robbery she did not know the names of the two women, but several days later, she saw the two women in the food stamp office and obtained the name of at least one of them. This information, which she relayed to the police, resulted in the arrests of the two defendants.
The defendants contended that they were not guilty of armed robbery because they had no weapon and because they obtained the money from Belvin Sanders pursuant to a plan in which Sanders was involved.
Elizabeth Stewart, a witness for the defense, testified that one afternoon she and the defendants went to the station where Sanders was employed and that Sanders initiated a conversation with Rita Davis. The essence of the conversation was that Davis could go back to the station one evening at which time Sanders would give her some money; would later call the police, after Davis had time to escape; report an armed robbery; and tell the police that she was unable to identify the perpetrators.
Stewart declined to be involved in the proposed activity, and the defendants testified that Davis informed Smith of the proposal to which Smith agreed. They testified that, on the basis of Sanders' proposal, they decided to engage in the proposed theft; went to the station; got the money from Sanders; and ran through the back where they were observed by a passer-by, later discovered to be Ricky Welsh, who lived in the area.
Both defendants testified that they saw Sanders in the food stamp office and that they did not divide the money they had gotten from the station with Sanders because the amount was very small, $58, and they thought that Sanders had "held out" on them. The implication from their testimony is that once Sanders was informed at the food stamp office of their intention not to divide the money with her, she, Sanders, became angry and identified them to the police. The defendants were arrested late on the same day or in the early morning hours of the next day after their meeting with Sanders in the food stamp office.
Ricky Welsh, who appeared as a hostile witness for the State, knew both Sanders and Davis prior to the robbery. Although he had identified Davis at a lineup, he recanted this identification at trial and testified that the two defendants could have been the same two people he saw running *773 away from the station the night of the robbery.
Obviously, Belvin Sanders' credibility was of vital importance to the State in this prosecution for armed robbery. This conclusion is reinforced by the State's closing argument to the jury, which was devoted almost entirely to the credibility of this witness.
The fact that Belvin Sanders had been given a lie detector test came to the attention of the jury in the following ways: On cross examination, defense counsel asked numerous questions for the purpose of testing Ms. Sanders' veracity and memory. In answer to defense counsel's question regarding what time she went to work the day after the robbery, she unresponsively mentioned that she had been taken to have a lie detector test:
"Q. . . . Did you work the day after the robbery?
"A. I worked that evening, that evening from 2:00 to 10:00, I thinkyeah, some time that day I worked.
"Q. Now, let's get this straight. You were on duty on July 14 from 10:00 a. m. until 6:00 in the morning, and you say the robbery happened about 11:00 in the morningI mean 11:00 at night?
"A. Somewhere around that time.
"Q. Around that time?
"A. Yeah.
"Q. You called the police that night, they came out, and the following day, which would be July 15, you went to work that evening from 2:00 to 10:00?
"A. I went to work after I had went my manager had taken me to a lie detector test, I went to work afterwards.
"Q. All right. Now, you're positive you worked that following day, is that correct?"
Sanders' testimony that she had taken a lie detector test was unresponsive to the question regarding the hours she had worked on the day following the robbery. Rather than request an admonition to the jury at this point, defense counsel continued with his cross examination. LSA-C.Cr.P. Art. 771. When defense counsel finished his cross examination, he asked that the jury be retired so that the matter could be discussed with the court. Defense counsel then stated that Sanders had unresponsively made reference to the lie detector test and asked that there be no further testimony regarding a lie detector test. The prosecutor requested that he be allowed to ask the witness if, in fact, she took a lie detector test and, if she did, if she returned to work after she had taken the test. The court ruled that the prosecutor could ask the question. The defense objected to the court's ruling and assigned error. On redirect examination the prosecutor did indeed bring out the fact that Ms. Sanders had taken a lie detector test and had returned immediately thereafter to work. The defense timely objected to these questions and was overruled. The prosecutor further brought out that Ms. Sanders had continued to work for the station for several months after the robbery; had quit the job because she was pregnant; and that she intended to return to her previous employment after the birth of her baby. Defense counsel objected to this line of questioning and was overruled by the court. Again in closing argument, the prosecutor sought to support Ms. Sanders' truthfulness by the fact that she had been retained in her employment and would return after the birth of her child.
Since the witness's answer to the defense counsel's original question was unresponsive, the State's contention that defense counsel opened the door for further questions regarding the lie detector test lacks merit.
In State v. Refuge, supra, we set forth the applicable principles as follows:
"Although there is no Louisiana decision in point, the universal rule in American jurisdictions is that (at least in the absence of stipulation) the results of a lie detector test are inadmissible when offered by either party, either as substantive *774 evidence or as relating to the credibility of a party or a witness. The essential reason is the lack of probative value and insufficient scientific reliability, as well as the possible unduly prejudicial effect upon lay triers of fact.
"* * * [Citations omitted.]
"Moreover, because of the reasons for which the test itself is inadmissible, these same authorities summarize the uniform holdings to be that likewise inadmissible is the willingness or unwillingness of a witness or a party to submit to such examination, as is evidence that the test was administered. Such evidence is excluded as an attempt by indirection to evade the direct prohibition against liedetection testimony for jury consideration, based upon the incompetency and unduly prejudicial effect of such testimony in judicial proceedings. See also Annotation, Propriety and prejudicial effect of comment or evidence as to accused's willingness to take lie detector test, 95 A.L.R.2d 819 (1964) and later case supplementing it.
"However, as there noted, if such evidence of this latter type is admitted, it may not necessarily be reversible error, depending upon whether the party was prejudiced by it.
"* * *
"In the present instance, an extremely close question is presented whether reversible error was committed by the State's improper elicitation of testimony as to whether a witness had taken a lie detector test. Nevertheless, we ultimately conclude that the error is not so prejudicial as to be reversible, upon examination of the entire record and in the context in which the error occurred."
See also, State v. Governor, supra; State v. Corbin, supra, McCormick on Evidence, supra, Annotation, Physiological or Psychological Truth and Deception Tests, 23 A.L.R.2d 1306 (1952) and later cases supplementing it; 22A C.J.S. Criminal Law § 645(2); 32 C.J.S. Evidence § 588(4); 29 Am.Jur.2d, Evidence § 831; Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection, 70 Yale L.J. 694, 724-28 (1961).
After a careful examination of the entire record and review of our prior holdings as well as those of other jurisdictions, we are forced to conclude that not only was error committed but that the error committed substantially prejudiced the defendant and was, therefore, reversible. LSA-C.Cr.P. art. 921. In the present case, by eliciting impermissible testimony to the effect that the witness had taken a lie detector test and establishing that she had been retained in her employment, the State created the impression that the witness took the test; told the truth; and, therefore, was testifying truthfully at the trial. In our opinion, this represents a substantial evasion of the prohibition against lie detection testimony. In the case before us, the impermissible testimony was so prejudicial as to require reversal. LSA-C.Cr.P. art. 921.
For the reasons assigned, the convictions and sentences are reversed, and the case is remanded for a new trial in accordance with law and the views herein expressed.