406 So.2d 1331 (1981)
STATE of Louisiana
v.
Donald EDWARDS.
No. 64204.
Supreme Court of Louisiana.
November 16, 1981.
Rehearing Denied December 14, 1981.
*1334 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., Premila Burns Chumbley, Kay Kirkpatrick, Asst. Dist. Attys., for plaintiff-appellee.
Walton J. Barnes, II, Zachary, for defendant-appellant.
CALOGERO, Justice.
This appeal comes before us again, this time after a remand to the district court for a reopened hearing on the motion to suppress the inculpatory statements made by defendant, Donald Edwards. The statements were made in the presence of police officers shortly following his arrest on charges of first degree murder and aggravated burglary of one Ruth McInnis Todd.
From the original hearing on the motion to suppress, from the trial evidence, and from the reopened hearing conducted after our remand, the following sequence of events can be reconstructed.
On the Tuesday night of January 17, 1978, seventy-eight year old Ruth McInnis Todd was robbed and stabbed to death in her house in Baton Rouge. The perpetrators, with a box of old coins taken from the *1335 house, fled in Ms. Todd's yellow Rambler, the keys of which had been removed from her purse. This same vehicle, later parked opposite a 7-11 convenience store, aroused the suspicions of patrol officers Odom and Bourgeois when they drove past and observed the three occupants give them "a real good look." When the officers completed their turn around the block, the car had been abandoned but its interior was littered with wrappers of the type used for old coins. Having seen three males of the general description of those seen in the car in the 7-11 store and buttressed by the testimony of the clerk in the 7-11 store, Odom and Bourgeois chased an Olds Cutlass leaving the 7-11 parking lot. The officers arrested the three occupants, found wearing clothes similar to those observed when Odom and Bourgeois initially passed the parked Rambler. These three were released three days later (Friday afternoon) when their alibis for the time in which the Todd crime occurred proved strong, and the clerk, according to police officers, recanted his positive identification. Before the trio's release, one of them, Felton Porter, told homicide detective Gardiner that he had seen a "young dude" approach the Rambler while it was being inspected by officers Odom and Bourgeois, but then turn around and walk quickly away. By this time, detective Gardiner had also received lists of possible suspects from the auto theft and burglary divisions but these were not used because of information received over the weekend.
Late Friday evening and early Saturday morning, a person arrested and later released on a separate charge suggested two possible lines of inquiry about the Todd murder to Gardiner, one of which included the names of four young men: a local neighborhood information source, Michael Hatch, and three possible suspects, Norman Kent, Michael Sheppard, and "Mule". When the information given on the first line of inquiry proved unproductive over the weekend (that lead unexplained by the officers and not pertinent here), Gardiner returned on Monday morning to the four names and particularly to Michael Hatch, the alleged eyes and ears of the neighborhood. Michael Hatch revealed that around 11:00 or 11:15 P. M. on Tuesday, January 17th, he was leaving the Dalton Theatre area heading towards Plank Road when he met John Norman Kent, Michael Sheppard, and Donald Edwards (whose nickname was Mule). Although it was not particularly cold, the three were wearing gloves, carrying a box, and indicated that if the police came they'd "better haul." Hatch continued walking, saw the activity around the yellow Rambler parked across from the 7-11 store, and went home.
Likewise, in the course of investigating the Todd crime, Lieutenant Gill, supervisor of the armed robbery division of the Baton Rouge Police Department, received word from a confidential informant about a poker game which had taken place shortly after the murderprobably Wednesday or Thursday night. The same three young men, placed by Michael Hatch in the vicinity of the yellow Rambler under suspicious circumstances on the night of the murder, were present at the poker game at which old coins were used for betting. Furthermore, Gill's informant heard Norman Kent bragging about the Todd murder. Information supplied by this informant about where one of the participants was staying was verified as correct. A second informant, known only to Lieutenant Gill by a first name, telephoned in detailed information of the Rambler's location by the 7-11 store Tuesday night and spoke of seeing three males running from the vehicle.
With this information gathered by both the homicide and armed robbery divisions, but without a warrant, officers arrested John Norman Kent and Michael Sheppard[1] *1336 on Monday afternoon at their high school. Homicide detectives Gill and Breaux went to Donald Edwards' house around 2:00 P. M. that same day to arrest him. Not finding him home then, they returned with Officers Lasoyne and Allain as back-up around, 3:00 P. M. and arrested Edwards in the presence of both his parents. The officers gave him his Miranda warnings. According to the records, all three suspects were booked at 3:15 P. M. Norman Kent confessed to the crime and implicated Sheppard and Edwards. Questioning of Edwards began at 5:00 P. M. with Officers Allain and Lasoyne again reading him the Miranda warnings and obtaining his signed waiver. During the questioning, officers played Edwards a portion of Kent's confession. At 5:28 P. M. on Monday, January 23, 1978, Donald Edwards gave a taped statement of his own, admitting his complicity in the activities which culminated in the stabbing death of Ruth Todd.
After hearing the state's evidence at trial, particularly Edwards' taped confession and the testimony of Michael Sheppard, the jury found Edwards guilty of first degree murder and sentenced him to life imprisonment.
In his original appeal to this Court, defendant's counsel argued thirty assignments of error. As one of these, defendant alleged that the trial judge erred, at the hearing on the motion to suppress Edwards' inculpatory statement, in cutting off defense inquiries into the identity and reliability of the police informants. Such inquiry, he asserted, was necessary under State v. Scott, 355 So.2d 231 (La.1977) and the Supreme Court decisions of Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) and Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). It was determined by this Court on first entertaining defendant's appeal that such questioning should have been allowed relative to establishing the presence or absence of probable cause for the warrantless arrest of Edwards. In a per curiam opinion, the case was remanded to the district court to re-open the hearing on the motion to suppress with the instruction that if probable cause were not found to sustain the arrest, the trial judge should vacate the sentence and order a new trial to be held without the benefit of Edwards' taped inculpatory statement. If, on the other hand, the trial judge affirmed its denial of the motion to suppress by finding probable cause for Edwards' arrest, the case should be returned to this Court for further consideration of that and the other outstanding assignments of error made in the original appeal to this Court. State v. Edwards, 375 So.2d 1365 (La.1979).
On remand, the trial judge did determine that there was probable cause for the warrantless arrest of Donald Edwards for the aggravated burglary and murder of Ms. Todd. Upon this renewed appeal, defendant contends that the trial judge erred in this decision and alternatively that his other assignments of error, originally urged and not yet considered, warrant our reversal of his conviction. Thus, we address first this question of probable cause to make a warrantless arrest.

ASSIGNMENTS OF ERROR TWO, THREE AND TWENTY-TWO
La.C.Cr.P. art. 213, allows police officers to make arrests without a warrant when "(3) The peace officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer;" Concerning the standards for judging an officer's action in situations called for in the codal provision, this Court said in State v. Marks, 337 So.2d 1177 at 1181 (La.1976):
Reasonable cause, which we have treated as consonant with the probable cause concept, exists when the facts and circumstances known to the arresting officer and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. Reasonable or probable cause must be judged by the probabilities and practical considerations of everyday life on which average men, and particularly average police officers, can be expected to act.... (Citations omitted)
*1337 While the state's burden relative to the propriety of an arrest is far less than that concerning trial and conviction, mere suspicion on the part of the arresting officers is not enough. State v. Ranker, 343 So.2d 189 (La.1977); State v. Randolph, 337 So.2d 498 (La.1976).
When the defendant challenges the admissibility of a confession on the ground that it was the result of an arrest made without probable cause, the burden of showing admissibility rests on the prosecution. State v. Scott, 355 So.2d 231 (La. 1977); Brown v. Illinois, supra.
At the original hearing on the motion to suppress, there had been testimony that the implicating statement by Norman Kent, along with other evidence, prompted the arrest of Donald Edwards. On remand, the trial judge was not much impressed with the possibility of Kent's implicating statement having triggered the arrest of Edwards since Kent and Edwards may have been arrested simultaneously.[2] Nonetheless, the other facts shown at the earlier suppression hearing were, at the renewed hearing, buttressed and supplemented; and the court found that probable cause had existed to support the arrest of Edwards. That trial court ruling was not erroneous.
The police had received information from several sources: two informants reported to Lieutenant Gill and remain unidentified to the defense and to this Court;[3] a third informant reported to Detective Gardiner and was identified on remand as Michael Hatch.
This Court has held that the test used to ascertain the credibility of confidential police sources which provide the probable cause to make a warrantless arrest is the same as the one used to determine the credibility of information derived from confidential police sources and contained in a search warrant. State v. Rudolph, 369 So.2d 1320 (La.1979). That test set forth in the United States Supreme Court decision of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) was incorporated by this Court in State v. Paciera, 290 So.2d 681 at 685-686 (La.1974) wherein we said:
The affidavit submitted to the magistrate may be based entirely upon hearsay, but, if so, it must set forth underlying circumstances and details sufficient to provide a substantial factual basis by which the magistrate might find reliable both the informant and the information given by him. Factors which support the credibility of an unidentified informant include prior accurate reports or any specific independent corroboration of the accuracy of the instant report. Factors which support the credibility of the information reported include (a) direct personal observation by the informant, or (b), if the information came indirectly to the informant, the reasons in sufficient factual detail for the magistrate to evaluate and credit the reliability both of the indirect source and of the indirectly-obtained information... (Emphasis omitted)
See also State v. Smith, 350 So.2d 1178 (La.1977); State v. Linkletter, 286 So.2d 321 (La.1973).
The confidential information and sources upon which the state relies to argue the existence of probable cause to arrest do not fall short under the Aguilar/Paciera standards.
Lieutenant Gill's unidentified confidential informant (1) had, over about a seven year period, provided the authorities *1338 with information which led to armed robbery, burglary and murder convictions and (2) had been present at the poker game, had personally observed the use of the old coins for betting and had personally heard the remarks about the murder.[4] Additionally, the address of one of the participants given by this informant had been verified by the authorities.
Detective Gardiner's informant, Michael Hatch, was identified at the remand hearing. He had volunteered information about what he had seen on an earlier evening while returning home from the movies. Police officers conducting an ongoing criminal investigation are entitled to question those individuals who may have seen or heard something in the vicinity of the alleged criminal activity, and they are entitled to credit that information, absent knowledge of facts which would cast serious doubt on the information or its source.
Finally, it is immaterial that Officer Gardiner did not participate in the actual arrest of Donald Edwards. The observations and reports of fellow police officers who are engaged in related investigations can provide reasonable basis for an arrest. See State v. Linkletter, supra.
In summary, it is clear that by the morning of January 23, 1978,[5] the police knew that Norman Kent, Michael Sheppard and Donald Edwards had been seen wearing gloves, leaving the area where Ruth Todd's yellow Rambler had been abandoned, having in their possession a box, and indicating that they had "better haul" if the police approached. The police also knew that the same three were present at a poker game a day or two after the murder, at which game old coins were used for betting (old coins had been taken from Ruth Todd's house) and one of the three was bragging about the murder.
We affirm the trial judge's determination concerning probable cause to arrest and his ruling denying the motion to suppress the inculpatory statements of Edwards.[6] The assignments of error on this issue lack merit.
Because we pretermitted consideration of the other assignments of error on our first consideration of defendant's appeal, we address them now.

ASSIGNMENTS OF ERROR FOUR, FIVE, SIX, AND TWENTY-ONE
Besides the complaint discussed above, challenging the admissibility of the confession on probable cause grounds, the defendant argued other reasons for suppressing the statement. These are included in assignments of error four, five, six and twenty-one.
Defendant contends that he was not fully informed of the charges leveled against him when he was arrested, in contravention of Article I, Section 13 of the Louisiana Constitution of 1974 which provides in pertinent part:
"Section 13. When any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel. In a criminal prosecution, an accused shall be informed of the nature and cause of the accusation against him. (Emphasis supplied)
*1339 Edwards says that he thought the charges consisted only of aggravated burglary and purse snatching. Testimony of those involved in the arrest indicate otherwise.[7] Furthermore, defendant admits that prior to giving his statement, he was aware of the first degree murder charge.
In a similar vein, defendant claims that he was not fully advised of his constitutional rights before the statement was given. The Miranda requirements have been incorporated into the Louisiana Constitution of 1974, Article I, Section 13 (For complete discussion, see L. Hargrave. The Declaration of Rights of the Louisiana Constitution of 1974. 35 La.L.Rev. 1 (1974)). The trial record reveals that the state offered affirmative proof that Donald Edwards was informed of these rights orally at least twice. Then prior to giving the taped statement, he signed a waiver verifying that he understood that he was giving up the constitutional protections afforded him by these rights. His taped statement played for the trial jury and by this Court also contains a colloquy between the questioning officers and Edwards as to the rights he was waiving in making his statement.
A third contention in these assignments of error is that it was error to permit the statement's admission at trial because the defendant was "only seventeen (17) years old" and the statement was made "without conferring with or being in the presence of his parents." In briefs to this Court, defendant asks the Court to hold that the requirements set forth in State in the Interest of Dino, 359 So.2d 586 (La.1978) should apply equally to persons seventeen years of age as well as to juveniles (i. e., those under seventeen). Defendant's principle thrust is that a seventeen year old, while an adult for purposes of criminal law, is a minor rather than a major under the civil law. Furthermore, he points to the use of the word "minor" in the Dino opinion itself: "In any event, it is the general policy of our law to protect all minors from the possible consequences of immaturity." 359 So.2d at 593.
In Dino we were dealing with a juvenile; we repeatedly said juvenile;[8] and in laying down the rule, we held that it would apply to juveniles:
[We] hold that in order for the State to meet its heavy burden of demonstrating that a waiver is made knowingly and intelligently, it must affirmatively show that the juvenile engaged in a meaningful consultation with an attorney or an informed parent, guardian, or other adult interested in his welfare before he waived his right to counsel and privilege against self-incrimination. (Emphasis supplied) (Footnote omitted)
Therefore, the reference in the quotation cited by defense counsel was, at Best, merely a broad statement concerning the law and youngsters generally. At worst, it was an inadvertent use of the word "minor" in an opinion whose focus and restricted holding was juveniles. Dino, as we understand it, is not precedent for requiring that minors *1340 seventeen years of age have a parent present when making statements to police authorities.
The question of whether a seventeen year old minor should have a parent present during criminal interrogation is res nova. The age at which a teenager is by law construed to have or not have the maturity and competence to knowingly waive his or her constitutional rights is admittedly perhaps an arbitrary line. No doubt in actuality there are sixteen year olds whose knowledge of and ability to comprehend their legal rights surpasses the knowledge of many who are older but less wise.
The law, nonetheless, requires definition. We opted for a prophylactic rule in Dino and fixed the age at under seventeen: a line traditionally drawn for criminal responsibility between the juvenile[9] and the adult. There is no imperative reason to extend the Dino requirements to the minor who is a seventeen year old adult.
Finally, the voluntariness of the taped statement was challenged at the hearing on the motion to suppress. Clearly the burden of proving voluntariness lies with the state.
Before a confession may be introduced into evidence, the State must establish beyond a reasonable doubt that the inculpatory statement was freely and voluntarily made. La.C.Cr.P. art. 703(C); La. R.S. 15:541; State v. Glover, 343 So.2d 118 (La.1977). See also, State v. Cobbs, 350 So.2d 168 (La.1977); State v. Scott, 344 So.2d 1002 (La.1977); State v. McSpaddin, 341 So.2d 868 (La.1977); State v. Scott, 355 So.2d 231 at 233 (La. 1978).
However, it is equally as clear that "[t]he admissibility of the confession is a matter for determination by the trial judge, and his conclusions as to the credibility of witnesses testifying as to voluntariness will not be disturbed unless unsupported by the evidence." State v. Cobbs, supra,; State v. Schamburge, 344 So.2d 997 (La.1977); State v. Ross, 343 So.2d 722 (La.1977); State v. Hollingsworth, 337 So.2d 461 (La.1976).
The record contains no indication that the trial court abused its discretion. The state presented witnesses attesting to the voluntariness of Edwards' statement. These were countered by Edwards' contention that the officers questioning him on Monday afternoon extracted the statement from him through coercion. Officers Allain and Lasoyne returned to the stand, reaffirmed their initial disclaimers and specifically rebutted defendant's allegations. State v. Peters, 315 So.2d 678 (La.1978). Upon our review of the evidence presented at the hearing on the motion to suppress and at the trial on the merits, and of the taped statement of Edwards himself, the Court affirms the trial judge's decision that the statement admitted into evidence at trial was voluntarily made.[10]
Assignments of error four, five, six and twenty-one lack merit.

ASSIGNMENTS OF ERROR NUMBER SEVEN AND TWENTY-NINE
By these assignments, defendant asserts that the trial court erred in denying his motion to quash which challenged the constitutionality of Louisiana's first and second degree murder statutes.
On the date of the crime, La.R.S. 14:30, defining first degree murder, read: "First degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm." Second degree murder was the killing of a human being when the offender was engaged in the perpetration or attempted *1341 perpetration of certain enumerated felonies. Second degree murder was also "the killing of a human being when the offender has a specific intent to kill under circumstances that would be first degree murder under Article 30, but the killing is accomplished without any of the aggravating circumstances listed in Article 905.4 of the Louisiana Code of Criminal Procedure." La.R.S. 14:30.1 (added in 1977).
Defendant contends that the second definition of second degree murder, with its overlap with first degree murder, leaves the jury without a standard to guide its choice between the greater and lesser offenses. This Court answered the defense contention when it decided State v. Payton, 361 So.2d 866 (La.1978). In Payton, the Court held that in amending La.R.S. 14:30.1, the legislature also tacitly amended La.R.S. 14:30, introducing the aggravating circumstances of La.C.Cr.P. Art. 905.4 as specific essential elements of the crime of first degree murder. The Court then excised certain of the aggravating circumstances in La.C.Cr.P. Art. 905.4 from the definition of first degree murder in order to preserve the statute from other constitutional attack. The Court has held that heinousness; prior conviction for an unrelated murder, aggravated rape or aggravated kidnapping; and murder by one imprisoned under sentence for a felony, were not part of the definition of first degree murder although these remained valid considerations in the penalty phase of the bifurcated trial.
The record indicates that defendant was tried in conformity with State v. Payton, supra. The trial court instructed the jury at the close of the guilt phase of the trial that it had to find one of the constitutionally valid aggravating circumstances of La.C.Cr.P. Art. 905.4 in order to return a verdict of first degree murder. The trial court did erroneously include in the charge La.C.Cr.P. Art. 905.4(f): "(t)he offender at the time of the commission of the offense was imprisoned after sentence for the commission of an unrelated forcible felony." As that situation is wholly removed from the facts of the instant case, this mistaken inclusion could not possibly have prejudiced the defendant.
These assignments lack merit.

ASSIGNMENTS OF ERROR NO. 8, 9, AND 30
By these assignments, defendant contends that the court erred in finding the defendant competent to stand trial and "in failing to order the defendant to undergo further diagnostic evaluation after receiving reports from the sanity commission; " "in denying motions filed to have the defendant further evaluated to determine competency" and "by not declaring a mistrial (during the trial) as a result of (this) incompetency", and "in not allowing evidence to support the issue raised concerning this competence at various stages of the proceedings;" and "in refusing to grant a motion for a mistrial as a result of the temporary incompetence of the defendant during the sentencing hearing", and not allowing evidence of that incompetence to be put in the record.
Essentially the various complaints involved in these assignments of error address the single question of defendant's capacity to stand trial. The merit or demerit of each of them is essentially controlled by whether the trial judge was correct when he ruled following a Sanity Commission Hearing that defendant was capable of standing trial.
It is the defendant's burden to prove his incapacity to stand trial by a clear preponderance of the evidence. State v. Hamilton, 373 So.2d 179 (La.1979); State v. Coco, 371 So.2d 803 (La.1979); State v. Lawrence, 368 So.2d 699 (La.1979); State v. Weber, 364 So.2d 952 (La.1978); State v. Veal, 326 So.2d 329 (La.1976); State v. Flores, 315 So.2d 772 (La.1975); and State v. Marks, 252 La. 277, 211 So.2d 261 (1968).
The trial judge's ruling was a difficult one primarily because of defendant's failure (the trial judge found it a refusal) to cooperate with the two examining physicians who made up the appointed Sanity Commission. It was because of defendant's *1342 general lack of cooperation and his unresponsive and flippant answers that Dr. Silva, and Dr. Landry to a lesser degree, felt that defendant should be subjected to a longer period of observation of his mental status. It is noteworthy, however, that neither expressed the opinion that defendant was incapable of standing trial.
We recently had occasion to consider on appeal a case almost identical to this one. In fact, the same Sanity Commission, Drs. Silva and Landry, were involved there. State v. Holmes, 393 So.2d 670 (La.1981). We affirmed Holmes' conviction choosing to credit the trial judge's determination of capability on the strength chiefly of the judge's assessment that defendant was capable but intentionally uncooperative. As we said then, "defendant cannot prove his incapacity to stand trial merely by having stymied the efforts of the Sanity Commission."
The only difference between Holmes and this defendant, Edwards, in their respective cases is that in Holmes the trial judge called the defendant to the stand (over his objection) and asked him a wide variety of questions. In this case, the trial judge's assessment of Edwards' capacity to stand trial was correspondingly aided by his having observed defendant at various pretrial hearings and by having heard defendant testify as well, at a pretrial hearing.
As we stated in Holmes at 673:
It is ultimately the responsibility of the judge to determine whether a defendant possesses the mental capacity to proceed to trial. C.Cr.P. Art. 647. The report of the sanity commission is admissible as evidence, but it cannot be used as a substitute for the court's own judgment. State v. Lawrence, supra; State v. Crochet, 354 So.2d 1288 (La.1977); State v. Bennett, 345 So.2d 1129 (La.1977)). Moreover, a trial judge's determination of a defendant's capacity to stand trial is entitled to great weight; State v. Hamilton, supra; State v. Coco, supra; State v. Lawrence, supra; State v. Weber, supra; State v. Morris, 340 So.2d 195 (La.1976); State v. Flores, supra. Here, the trial judge did not refuse to accept the opinion of medical experts; no opinion as to the defendant's capacity to stand trial was offered, other than the suspicion that defendant was malingering. The issue is not whether the sanity commission usurped the judge's function, but whether the judge could reasonably make a determination of defendant's present sanity when the doctors could not.
We do not find erroneous the trial judge's determination in this case that the defendant was capable of standing trial. There is not merit to these assignments of error.

ASSIGNMENTS OF ERROR ONE AND TEN
Defendant contends that the trial court erred in denying his motion for a change of venue grounded upon excessive pretrial publicity. He further avers that, the trial judge erred in denying the motion to compel in camera hearings, including that concerning change of venue, thereby he jeopardized defendant's right to a fair trial before an impartial jury because of misleading or inadmissible evidence to which the public and the jury had been exposed by the attendant publicity.
Article 622 of the Louisiana Code of Criminal Procedure provides: A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of the witnesses at the trial.
To be entitled to a change of venue, the defendant must prove that there is such prejudice in the collective mind of the community that a fair trial is impossible. State v. Smith, 340 So.2d 222 (La. 1976); State v. Clark, 340 So.2d 208 (La. 1976); State v. Berry, 329 So.2d 728 (La. *1343 1976). Whether the defendant has made the requisite showing is a question addressed to the sound discretion of the trial judge. State v. Clark, supra; State v. Berry, supra; State v. Wilkerson, 326 So.2d 353 (La.1976); State v. Stewart, 325 So.2d 819 (La.1976).
State v. Passman, 345 So.2d 874 at 880 (La.1977) summarizes the considerations governing the exercise of that discretion:
In State v. Bell, 315 So.2d 307 (La.1975), this Court set forth the following factors to be considered in determining whether to change venue:
* * * (1) (T)he nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. 315 So.2d at 311.
Other facts we regard as relevant to this inquiry include:
* * * The degree to which the publicity has circulated in areas to which venue could be changed, the care exercised and the ease encountered in the selection of the jury, the familiarity with the publicity complained of and its resultant effect, if any, upon the prospective jurors or the trial jurors, and the peremptory challenges and challenges for cause exercised by the defendant in the selection of a jury. See, generally, Annotation 33 A.L.R.3d 17 (1970); State v. Berry, 329 So.2d 728 (La.1976).
To the first factor, defendant argues that from the night of the murder until trial there was "widespread and excessive" publicity about the murder and the three suspects who were indicted for the murder. At the hearing on the motion to change venue, the defendant presented several witnesses[11] to support his contention. From the record of these proceedings there does not appear to be any showing that the media reports were other than "objective coverage." State v. Bennett, 341 So.2d 847 (La.1976); State v. Stewart, supra.
The state contends that the publicity was not excessive and did not supercede the degree of publicity in other cases in which this Court upheld the denial of the motion for a change of venue.[12] See, State v. Williams, 354 So.2d 562 (La.1978); State v. Berry, supra; State v. Wilkerson, supra; State v. Stewart, supra. Publicity, merely because it is extensive, does not mandate a change of venue. It must affect the defendant's ability to receive a fair trial.
We do not find that it did.[13]
*1344 The second factor, the connection of government officials with the release of the publicity was shown by the testimony of former Chief of the Baton Rouge City Police, Howard Kidder, and Assistant District Attorney, Premila Chumbley. Chief Kidder testified that he gave a brief impromptu factual press conference on the night that Sheppard, Kent, and Edwards were arrested.
However, no inflammatory actions at this conference was alleged by the defendant.
Mr. Kidder compared this press conference with other press conferences in other major murder cases and noted that this press conference was nothing out of the ordinary.
On April 12, 1978, at the second hearing on the motion, Premila Chumbley, an assistant district attorney, testified that she gave newsman John Voinche mug shots of the three defendants in response to his asking if she could identify each of the three defendants on some footage that Channel 9TV allegedly had.
Ms. Chumbley stated that "(i)t was not until I went home that night and viewed the six o'clock news that I saw these particular mug shots were run in and of themselves." Without mentioning these mug shots in his brief, defendant argued that the assistant district attorney's actions connected a government official to the release of information.
To this Ms. Chumbley testified that she did not intend for these mug shots to be used on television. Furthermore, the persons seeing these photographs on television probably, if they even realized that they were mug shots, would have thought that they were taken when the defendants were arrested for this crime. Even if the release of the mug shots prejudiced the defendant, the release occurred approximately 2½ months prior to the hearing and approximately 8 months before his trial, so that the prejudicial effect of the pictures' release (eight months earlier) if any existed had been severely diminished by the time of defendant's trial.
The third factor in the test for a motion to change venue concerns the length of time between the dissemination of the publicity and the trial. The defendants were arrested on January 23, 1978. The television broadcasts occurred on January 18, 23 and February 1, 1978. Newspaper articles were published on January 18, 21, 24 and 27. Defendant's trial did not begin until September 5, 1978.[14] Therefore, a seven month period elapsed between this publicity and the trial.
The severity and notoriety of the offense is the fourth factor of the test. While the brutal stabbing of a seventy-eight year old woman by three teenagers would be severe and potentially a notorious crime, no public outcry of rage and vengeance was proven to have occurred in this case.
The fifth factor concerns the area from which the jury is to be drawn. In this case, the juror were drawn from the Parish of East Baton Rouge and defendant established that all of the publicity covered this area.
The sixth factor includes other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant. The defense argued that a certain film shown on television which depicted Donald Edwards and the other two defendants walking in the courthouse would affect the attitude of the community. Dr. Prestholdt testified that on the film that was shown on Channel 2 in Baton Rouge, the defendant, Donald Edwards, was acting in a very inappropriate manner. He stated, "I would describe his behavior as being a mugging behavior; okay, an outrageous kind of behavior; waving his arms and mugging in front of the camera, showing off, cocky or flippant or unconcerned on hison his behavior." The other visual presentation described by Dr. Prestholdt was a drawing at *1345 the assignment of attorneys which depicted defendant sitting at a table with his head down on his arms. Dr. Prestholdt stated that, "... I assumed asleep or at least resting or at least not attending to the court proceedings that were going on. "Dr. Prestholdt concluded that these presentations made the defendant seem "cold, remorseless, and insolent."
At the change of venue hearing, the assistant district attorney contended that the behavior of Donald Edwards should not be charged to the state. Donald Edwards chose to behave this way on the film. The film only depicted what was actually done by the defendant. A change of venue should not be granted on the defendant's inappropriate actions alone. Furthermore, this film was shown approximately seven months prior to defendant's trial. Any potential for prejudice would have been decreased by the time of the trial.
No actual evidence was presented as to the seventh factor. That factor concerns anything likely to affect the candor and veracity of the prospective jurors on voir dire. The defense attempted to argue that the film of Donald Edwards' insolent behavior would affect the candor and veracity of the jurors. That allegation is not supported by the evidence. Defendant did not carry his burden of proof as to this factor.
After reviewing all of the evidence presented at the hearing, we cannot say that the trial judge erred in finding that the defendant did not carry his burden of proving that a fair and impartial trial could not be obtained in East Baton Rouge Parish.
As an alternative to a change of venue, defendant wanted the pre-trial proceedings to be conducted in camera.
The defendant's primary contention concerning the in-camera hearing was that the publicity arising from pre-trial hearings might be rife with statements and allegations which would be inadmissible at the trial on the merits. If so, he alleged his ability to receive a fair trial would be jeopardized. Defendant cites, however, no specific instances to support his contention that pre-trial publicity prejudiced his right to a fair trial.
In State v. Lewis, 353 So.2d 703 (La.1977) this Court found that the defendant's request for in-camera proceedings was properly denied by the trial court. The defendant in that case, as in this one, offered no authority to conduct pretrial hearings in camera; made no showing that in-camera hearings were necessary; nor did he make any allegations on appeal that prejudicial publicity actually resulted from the public hearings.
This assignment of error, concerning both the motion for a change of venue and the motion to compel in camera hearing, lacks merit.

ASSIGNMENTS OF ERROR NUMBER ELEVEN, TWELVE AND FIFTEEN
By these assignments, the defendant complains that the trial court erroneously granted the state three challenges for cause of prospective jurors.
Initially, we note that the record shows that the state used only ten of its twelve peremptory challenges. La.C.Cr.P. art. 799. Consequently, the erroneous allowance to the state of a challenge for cause to a prospective juror is not grounds for a defense complaint unless the effect of the ruling is to allow the state more peremptory challenges than it is entitled to by law. La.C.Cr.P. art. 800; State v. Labostrie, 358 So.2d 1243 (La.1978). In the instant case, therefore, defendant would have reason to complain only if all three of the challenges were erroneously granted.
The trial judge is vested with broad discretion in ruling on challenges for cause and his ruling will be reversed on review only where it appears, upon review of the voir dire examination as a whole, that the judge's exercise of that discretion has been arbitrary and unreasonable, resulting in prejudice to the accused. State v. Sonnier, 379 So.2d 1336 (La.1980), (on rehearing); State v. Labostrie, supra; State v. Sheppard, 350 So.2d 615 (La.1977).
*1346 Two of the prospective jurors for whom the trial judge granted the state's challenges for cause knew defendant's family. These jurors expressed concern about their ability to reach a verdict based solely upon the evidence presented at trial. The trial judge therefore did not err in granting challenges for cause of these two prospective jurors. The third juror of whose dismissal defendant complains, presents a closer question, as this juror stated that she had read newspaper accounts of the crime when it first occurred and expressed concern about the release of the first suspects arrested in the case, wondering if perhaps defendant had also been mistakenly arrested. We need not reach the question whether the trial judge erred in granting the challenge for cause of this juror. Even if the challenge was erroneously granted, it did not have the effect of giving the state additional peremptory challenges because the state used only ten of its allotted twelve peremptory challenges.
These assignments lack merit.

ASSIGNMENTS OF ERROR NUMBER THIRTEEN AND SIXTEEN
By these assignments of error, the defense asserts that the trial court improperly excused thirteen prospective jurors on Witherspoon grounds.
The trial court excused these prospective jurors because of their expressed fixed opinions against the death penalty. La.C.Cr.P. art. 798(2). The voir dire examination reveals that these jurors responded to questions regarding returning a death penalty with answers such as: "I couldn't take the boy's life," and "I would never go with death regardless of what the evidence or the law would be." The trial judge's rulings were therefore correct in each case.
Defense counsel argues that Witherspoon challenges have no role in a bifurcated capital sentencing scheme. In State v. George, 371 So.2d 762 at 765 (La.1979), this court observed that "examination of the Witherspoon decision discloses that the statute involved therein provided for a bifurcated proceeding similar to ours, allowing the jury the discretion to impose a sentence of death or imprisonment." Defendant's argument has thus been rejected by this court.
Furthermore, this defendant did not receive the death sentence and this court has consistently held that a defendant who does not receive the death penalty has no valid Witherspoon complaint. State v. George, supra; State v. Drew, 360 So.2d 500 (La.1978); State v. Sheppard, supra.
There is no merit to these assignments.

ASSIGNMENT OF ERROR NUMBER FOURTEEN
With this assignment, defendant contends that the trial court improperly denied his challenge for cause of a prospective juror, one Rachel M. Guillot.
Miss Guillot remembered reading about the crime at the time it occurred. She stated that she had a "soft spot in [her] heart for old people, especially old women." She had previously said that she had no feeling of revenge and did not consider service on the jury to be her chance to avenge the death of the victim.
Before ruling on defendant's challenge of this prospective juror, the trial judge asked whether she could take the evidence presented in the courtroom and arrive at a decision free of prejudice and bias. The juror responded that she felt that she could. When asked whether she could give defendant a fair trial, the juror told the judge that she would try to do so. Upon receiving these answers, the trial judge denied the challenge.
As stated in our treatment of assignments of error numbers eleven, twelve, and fifteen, the trial judge is vested with broad discretion in ruling on challenges for cause. Only if his exercise of that discretion is arbitrary or unreasonable will his ruling be reversed on appeal. This juror stated that she felt that she could arrive at a decision based upon the evidence and free of bias and prejudice, and that she would try to give defendant a fair trial. Her answers were sufficient to indicate that she could be a fair and impartial juror.
*1347 The trial judge did not err in denying the challenge for cause of this juror. The assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER SEVENTEEN
This assignment concerns the defense assertion that the trial judge erred in denying the motion to quash the jury.
The petit jury venire was exhausted mid-way through jury selection. Defense counsel questioned how this could happen when the venire contained one hundred twenty-five people and just over seventy had been called for examination. The jury coordinator testified that of the one hundred fifty called for the general venire, four or five did not receive their subpoenas, six exercised their statutory exemptions under La. C.Cr.P. art. 403 and sixty-seven had been excused by judges of the Nineteenth Judicial District. These excuses were for a variety of reasons, including work hardships, doctor's excuses, and having small children at home. The prospective jurors would record the excuse on their subpoenas and send them back to the jury commission. The courts in the district then passed upon the excuses individually.
Following this testimony, defense counsel moved to quash the petit venire and for a mistrial, explaining to the court that he had known that something was wrong before trial began because the number of people on the venire was too low. The trial court denied the motion to quash as being untimely and then denied the motion for a mistrial because the court did not find any abuse of discretion in excusing the prospective jurors.
Counsel argues that the excusal of the jurors denied defendant his right to a jury composed of a fair cross section of the community.
The trial court correctly observed that defendant's motion to quash the petit venire was untimely. As set forth in State v. Collins, 359 So.2d 174 at 177 (La.1978): "[t]he correct procedural device for alleging that the general or petit jury venire was properly drawn, selected or constituted is a motion to quash. LSA C.Cr.P. art. 532(9). The failure of defendant to timely file one constitutes a waiver of the objection." La.C. Cr.P. art. 535(B)(2) (now amended (D)) requires that the motion to quash be filed before trial. While it is conceivable that problems with the petit jury venire might not become apparent until after jury selection has begun, counsel by his own admission knew of the dwindling venire a week before trial.
Furthermore, in State v. Cass, 356 So.2d 936 at 937 (La.1978), this Court noted:
La.Code Crim. P. art. 783 authorized the court to excuse a member of the petit jury venire at any time prior to the time he is sworn as a juror to try a particular case if jury service would result in "undue hardship or extreme inconvenience." We have held that a defendant need not be present when the trial judge excuses prospective jurors before his case is called for trial. State v. Sheppard, 350 So.2d 615 (La.1979); State v. Williams, 258 La. 801, 248 So.2d 295 (1971). Moreover, the trial court is vested with broad discretion in excusing prospective jurors for undue hardship. State v. Ivy, 307 So.2d 587 (La. 1975). This discretion to release prospective jurors in advance of voir dire examination is not to be disturbed unless there is a showing of fraud or collusion resulting in prejudice to the accused. State v. Sheppard, supra; State v. Gomez 319 So.2d 424 (La.1975)
Defense counsel did uncover what appeared to be two instances of abuse of discretion: a dislike of Baton Rouge traffic on the part of one person called for jury duty and a prior engagement with the Miss America Beauty Pageant for another. Other than these instances, the excuses noted on the subpoenas are legitimate reasons for excusal from jury duty. The two improper excusals are not sufficient to taint the jury selection process and counsel does not point to a pattern of exclusion, or other suggestion of fraud or collusion at work in the case.
This assignment is without merit.

*1348 ASSIGNMENT OF ERROR NUMBER EIGHTEEN
By this assignment, defendant contends that the trial court erred in denying the motion to quash on grounds of the state's systematic exclusion of blacks from the jury panel.
Mrs. Todd, the victim in the case, was white. The jury that heard the case was all white. Defendant is black. At the close of jury selection, counsel moved to quash the panel on grounds that the state had used eight of its ten peremptory challenges to excuse black jurors. His motion was denied.
Counsel argues that the state deprived defendant of the equal protection of law, LSA-Const. 1974, art. I, § 3 by manipulating its peremptory challenges to assure an all-white jury.
In State v. Brown, 371 So.2d 751 (La. 1979), this court followed Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), with regard to equal protection challenges raised against jury selection in a particular case. Swain held, in effect, that "it is permissible to insulate from inquiry the removal of Negroes from a particular jury on the assumption that the prosecutor is acting on acceptable considerations related to the case he is trying, the particular defendant involved and the particular crime charged." 380 U.S. at 223, 85 S.Ct. at 837. 13 L.Ed.2d at 774. In Swain's analysis, the conscious exclusion of blacks from a particular jury would only violate the Fourteenth Amendment when it became so broad as to be the functional equivalent of systematic exclusion from the grand or petit jury venires.
In light of Swain, this Court has required proof of the "systematic exclusion over a period of time"[15]State v. Bias, 354 So.2d 1330 (La.1978). Admittedly, this case was tried in the same parish where the Brown conviction was in fact reversed because a conscious pattern of exclusion was documented in connection with the particular prosecutor involved. Defendant in this case, however, has not shown that his prosecutor, Premila Chumbley, has exercised the challenges systematically in the past, or that she acted in accord with a long-standing policy of the office.[16]
This assignment of error lacks merit.

ASSIGNMENTS OF ERROR NUMBER NINETEEN AND TWENTY-THREE
By these assignments, the defendant complains that the trial court erred in admitting hearsay evidence, and erred further in denying a motion for mistrial on grounds of a state witness' mention of a polygraph examination.
As set forth above, this case began with the arrest of three other persons for the Todd murder. The state took pains to explain this false state to the jury. Officer Odom thus testified that a statement from Randy Carreca, an employee at the 7-11 store, had triggered the arrests. Asked by the state, over the defense hearsay objection whether Carreca had then changed his story, Odom replied that he had. As a result, the three were released from custody. *1349 Officers Gardiner and Crouch also over defense objections, confirmed that account.
The defense argues in brief that the officers' account of Carreca's statements was inadmissible hearsay. Carreca later took the stand to testify flatly that defendant was not one of the three persons who emerged from the victim's car outside the 7-11 store. Counsel thus concludes that the admission of the hearsay evidence severely prejudiced the defense, as it tended to impeach the witness before he had a chance to take the stand. LSA-R.S. 15:484.
In State v. Martin, 356 So.2d 1370 at 1376 (La. 1978), this court adopted Professor McCormick's definition of hearsay as "testimony in court ... of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." As pointed out in State v. Ford, 368 So.2d 1074 at 1077 (La.1979), under this definition, "a witness is generally competent to testify that a statement has been made to him [so long as no attempt is also made to vouch for the credibility of its contents]. In that case, the fact of communication turns as much on the credibility of the in-court witness as it does the out-of-court asserter."
For that reason, this court has repeatedly held that in explaining his own actions, a police officer may refer to statements made by other persons involved in the case. As set forth in State v. Calloway, 324 So.2d 801 at 809 (La.1976), the statements are "admitted not to prove the truth of the assertion... but to explain the sequence of events leading to the arrest of the defendants from the viewpoint of the arresting officers. The testimony [is] therefore not hearsay." See State v. Monk, 315 So.2d 727 (La.1975); State v. Bluain, 315 So.2d 749 (La.1975); and State v. Carvin, 308 So.2d 757 (La.1975).
In this case, the officers' testimony was therefore proper as an explanation of how (at least in the state's theory), the investigation, initially deflected, got back on track.
It was in Officer Crouch's confirmation of the release of the Felton trio that he went on to volunteer that the release turned on "[t]he evidence that we found later, plus through the investigation, polygraph test ...." Counsel immediately demanded a mistrial for the polygraph remark. The trial court denied the motion; but at counsel's request, admonished the jury the "[e]vidence of any polygraphs are not admissible in a court of law. You should disregard any mention of any polygraphs and you should not speculate on the fact of who may have taken it and who may not have taken any polygraphs in this matter."
The trial court's admonition to the jury was entirely correct. La.C.Cr.P. art. 771. The results of a polygraph test are inadmissible in a criminal trial. State v. Governor, 331 So.2d 443 (La.1976); State v. Refuge, 270 So.2d 842 (La.1974). The willingness or unwillingness of a person to take the test is similarly inadmissible. State v. Davis, 351 So.2d 771 (La.1977). Since the remark did not unambiguously point to the defendant, it did not call for a mistrial under La.C.Cr.P. art. 770. See e.g., State v. Titus, 358 So.2d 912 (La.1978). Likewise, the unresponsive remark did not point unambiguously to any of the other suspects in the case. The defendant was not prejudiced. State v. Weeks, 345 So.2d 26 (La.1977). Compare State v. Davis, 351 So.2d 771 (La.1977).
These assignments of error lack merit.

ASSIGNMENTS OF ERROR NUMBER TWENTY AND TWENTY-FOUR
Defense counsel contends that the trial court erred in allowing certain photographs into evidence. It is his assertion that the probative value of these pictures was outweighed by their prejudicial effects. State v. Kelly, 362 So.2d 1071 (La.1978).
Photographs of the victim's body are generally relevant to prove corpus delicti; to corroborate other evidence of the manner in which death occurred; to establish the location, severity and number of *1350 wounds; to establish the identity of the victim. State v. Manieri, 378 So.2d 931 (La.1979); State v. Cooper, 334 So.2d 211 (La.1976). The fact that the photographs may be gruesome does not in and of itself render them inadmissible. State v. Beach, 320 So.2d 142 (La.1975); State v. Curry, 292 So.2d 212 (La.1974). The defense argues that its offer to stipulate to the identity of the victim and the nature of the death, together with testimony of Dr. Massey, of investigating officers and of the photographer rendered the admission of the photographs cumulative rather than probative. However, the admissibility of photographs is primarily a question reserved to judicial discretion. State v. Rester, 309 So.2d 321 (La.1975); State v. Harvey, 358 So.2d 1224 (La.1978); State v. Gilmore, 332 So.2d 789 (La.1976). Not all photographs tendered by the state were admitted. In viewing those that were, this court is of the opinion that the trial judge did not abuse his discretion.
These assignments of error lack merit.

ASSIGNMENT OF ERROR NUMBER TWENTY-FIVE
By this assignment, the defense asserts that the trial court erred in failing to bar the state's star witness from testifying.
Trial began on September 5, 1978. On September 11, 1978, Michael Sheppard appeared as a witness for the prosecution and recounted the details of the slaying of Ms. Todd. The deal for his testimony had been confected on September 10, the day before he testified. The defense objected to his testimony on the grounds that the state had not given notice of Sheppard's appearance in its opening statement. Counsel relied on La.C.Cr.P. art. 769 which provides that "[e]vidence not fairly within the scope of the opening statement of the state shall not be admitted in evidence."
La.C.Cr.P. art. 766 requires the state to set forth its theory of the case only in "general terms" in the opening statement. It is not necessary that the state detail every shred of evidence in an opening statement. It is sufficient for the state to give a general description of the evidence it plans to introduce. State v. Berain, 360 So.2d 822 (La.1978). The state need not name all of its witnesses in the opening statement; it need not name the co-perpetrators it intends to call at trial. State v. Square, 257 La. 743, 244 So.2d 200 (1971).
In his opening statement, the prosecutor set forth in detail what the state intended to prove in the case: that defendant actively participated in the killing of Ms. Todd and in the escape from the crime scene in her car. La.C.Cr.P. art. 769 allows the court to admit evidence which the prosecutor inadvertently and in good faith omits from his opening statement. The testimony of Michael Sheppard clearly falls within the scope of the evidence outlined in the opening statement. The omission of this witness from the opening statement cannot be classified as purposeful or in bad faith when the witness did not agree to testify until five days after the beginning of trial. The prosecutor could not have included reference to Michael Sheppard in the opening statement.
There is no merit to this assignment.

ASSIGNMENT OF ERROR NUMBER TWENTY-SIX
With this assignment, defendant argues that the trial judge improperly admitted evidence of other crimes attributable to him.
In the account of Michael Sheppard, defendant had proposed the entire affair: Edwards and Kent had arrived at Sheppard's house, defendant suggesting "let's go make a hit ... over there at this lady's house...." The plan got off to a ragged start. The trio went first to a grocery store where defendant stole some wine. The three then went looking for a car so that they could go to the lady's house to steal her car. Two attempts at theft failed and the trio returned to Kent's house. Ultimately, the group made its way to the victim's residence on foot.
After the killing, the three sped away from the scene with defendant at the wheel of the victim's car. As the robbery coincident *1351 with the murder had netted only a few "old bitty coins in a box," defendant suggested another "hustle". Defendant, still driving the victim's car, followed another woman to the LSU campus where he instructed Sheppard to snatch her purse. The potential victim saw Sheppard coming and he abandoned the plan. Still looking for another "hustle", defendant eventually parked across the street from the 7-11 where Officer Odom's appearance terminated the night's activities.
At each mention of the other offenses detailed in Sheppard's account, defense counsel objected and renewed initial demands for a mistrial. In defendant's view, the other crimes evidence was inadmissible under State v. Prieur, 277 So.2d 126 (La. 1973), and La.R.S. 15:445 and 446, and highly prejudicial to the defendant.
Prieur, however, recognized the res gestae exception of La.R.S. 15:447 to the inadmissibility of evidence of other crimes. The statute defines res gestae as "events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants ..." La.R.S. 15:447. La.R.S. 15:448 provides: "To constitute res gestae the circumstances and declarations must be necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction."
The murder of Ms. Todd did not occur in a vacuum. As Michael Sheppard related, defendant suggested the criminal activity which culminated with the death of the victim. The theft of the victim's car can hardly be said to be unrelated to her death. Using the victim's car, defendant and his cohorts continued their night of criminal activity. The sequence of events did indeed form "one continuous transaction" with the crime for which defendant was being tried and therefore were properly admitted under the res gestae exception to the prohibition against the introduction of other crimes evidence. As this court remarked in State v. Curry, 325 So.2d 598 at 602 (La.1976), "[w]ithout [such] evidence, the complete story of the crime [could] not be told."
The trial judge did not err in allowing Michael Sheppard to detail fully the criminal activity in which defendant engaged on the night on which the murder was committed.
The assignment is without merit.

DECREE
For the foregoing reasons, defendant's conviction and sentence are affirmed.
DENNIS, J., concurs with reasons.
DENNIS, Justice, concurring.
I respectfully concur.
Although it is not free from doubt, the defense counsel appears at trial to have challenged the exclusion of black persons from the jury purely on the ground of statistical imbalance, rather than on the ground that the prosecuting attorney exercised her peremptory challenges on the basis of race.
NOTES
[1] Michael Sheppard pleaded guilty to manslaughter pursuant to an agreement to testify for the state at the trials of Norman Kent and Donald Edwards, respectively. Norman Kent was successful in having his confession suppressed because he was fifteen at the time it was made without the prior consultation mandated by Dino. State v. Kent 371 So.2d 1319 (La.1979). He was convicted nonetheless and his conviction was affirmed by this Court. State v. Kent, 391 So.2d 429 (La.1981).
[2] Police records show that Edwards and Kent were both booked at 3:15 P.M., January 23, 1978.
[3] The defense again urges in this appeal that in order for the state to sustain its burden of proving that the arrest was legal, the identity of all informants must be revealed. This Court has never so required. In State v. Diliberto, 362 So.2d 566 (La.1978) this Court stated:

When the issue is not guilt or innocence, but instead the probable cause for an arrest or search, police officers need not invariably be required to disclose an informant's identity, if the trial judge is convinced, by evidence submitted in open court and subject to cross-examination, that the officers did rely in good faith upon credible information supplied by a confidential informant. McCray v. Illinois, 386 U.S. 300, 305, 87 S.Ct. 1056, 1059, 18 L.Ed.2d 62, 67 (1967).
[4] Admittedly, Gill's second informant, known only by a first name, did not meet Aguilar requirements, but the information about three males running from the Rambler was only cumulative.
[5] Defendant also argues that, if the police had the information in advance, they should have obtained a warrant. Generally, there is no requirement that an officer with probable cause to arrest obtain an arrest warrant. State v. Linkletter, 345 So.2d 452 at 456 (La.1977); But see Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) and State v. Brown, 387 So.2d 567 (La. 1980).
[6] Because we find that the arrest was legal because based on probable cause, we need not consider the state's alternative argument that the statement was sufficiently attenuated from the illegal arrest to allow its admission at trial. See Brown v. Illinois, supra.
[7] His parents testified that they were not aware of the murder charge until they saw it on the ten o'clock news. However, Mrs. Edwards admits that Officer Gill told her that she could either accompany her son to the station, or phone in thirty minutes for any added information she needed. She did phone the station. Then within several hours and before the late evening news, two officers returned to the Edwards residence, obtained Mrs. Edwards' permission to search, and seized a pair of Converse tennis shoes, a pair of jeans and a hat belonging to Donald.
[8] For example:

Similarly, the rights which a juvenile may waive before interrogation are so fundamental to our system of constitutional rule and the expedient of requiring the advice of a parent, counsel or adviser so relatively simple and well established as a safeguard against a juvenile's improvident judicial acts, that we should not pause to inquire in individual cases whether the juvenile could, on his own, understand and effectively exercise his rights. Assessments of how the "totality of the circumstances" affected a juvenile in a particular case can never be more than speculation. Furthermore, whatever the background of the juvenile interrogated, assistance of an adult acting in his interest is indispensable to overcome the pressures of the interrogation and to insure that the juvenile knows he is free to exercise his rights at that point in time. (Emphasis supplied) supra at 592. (Footnotes omitted)
[9] Though the word juvenile is without ambiguity as it appears in the statutes, the demarcation line for the court's jurisdiction for juvenile offenders lies at "less than seventeen." For a thorough discussion of the relevant statutory language contained in La.Const. Art. 5, Section 19, LSA R.S. 13:1569(3) and (4), LSA R.S. 13:1571.1(C) and C.J.P. Art. 13(7) and (9), see State in the Interest of Lewis, 377 So.2d 1322 at 1323, 1324 (La.App. 1st Cir., 1979).
[10] Counsel for the defense also raised the competency question at the motion to suppress. This question is addressed thoroughly in our discussion of Assignments of Error Eight and Nine.
[11] Dr. Perry H. Prestholdt, an expert in the field of social psychology was called by defendant to describe the nature of the pretrial publicity. He testified that there were six television news broadcasts concerning the murder on three days, January 18, 23, and February 1, 1989. On cross-examination. Dr. Prestholdt admitted that he had done no studies to discover the effect of the pre-trial publicity in the present case. Furthermore, Dr. Prestholdt admitted that normally in a news report on a homicide one would find the name and age of the victim, the means of inflicting death, and the names, ages, and addresses of the arrested persons.

Mr. John Spain, the news director of Channel 2 confirmed that these stories were only forty-five to sixty seconds long. However, since the segments were shown on both the 6:00 and the 10:00 p. m. news there was a total of six segments.
[12] John Spain, the news director of Channel 2, compared the case with the State v. Bell, supra and the Valerie Morelock case (State v. Sheppard, 350 So.2d 615 (La.1977). He stated that the present case generated "quite a bit less" coverage than those cases.

In State v. Foy, 278 So.2d 38, at 41, (La.1973), this Court upheld a denial of a motion to change venue because the publicity in the matter "was not greater than in other cases of similar nature" and because defendant had not borne his burden of proving a sound reason for change of venue.
[13] In addition to the television coverages most of the newspaper articles were not even on the front page of the newspaper. Furthermore, the grand jury indicted the defendant on February 1st and the last news coverage before the hearing was on February 3, 1978, a full seven months before trial.
[14] Although more than likely there was publicity immediately prior to the trial, that publicity is not before the court.
[15] Only two of the seven present members of this court have in the past expressed a different view. In State v. Eames, 365 So.2d 1361 (La. 1979), Justice Dennis, with the author of this opinion joining him in a concurrence, was of the view that under Article I, § 3 of the Louisiana Constitution of 1974, once it has been shown that the prosecutor has used a disproportionate number of challenges or otherwise eliminated a disproportionate number of members of one race as compared to the remaining number in the venire after excuses, exemptions, or removals for cause; then a prima facie case of discrimination has been made out; the burden shifts to the prosecutor to show that the challenges were not made on a racial basis; the prosecutor may sustain this burden by presenting evidence that the challenges were not racially motivated. Supra at 1366.
[16] For her part, the prosecutor disclaimed any suggestion of bad faith. She explained that "[o]f course, the state [peremptorily] challenged many of the people ... because it did not feel that they were very strong on the death penalty issue." She added:

As your Honor knows, I have been prosecuting in this particular Court for approximately one year and I have taken blacks on my jury, and I would respectfully disagree with the fact that the State had historically and that this particular prosecutor has historically excluded blacks from the jury.
The prosecutor's disclaimer stands unrebutted.