Judgment rendered May 25, 2002.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,396-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

WESTLY X. FREEMAN                          Appellant

* * * * *

Appealed from the
Fifth Judicial District Court for the
Parish of West Carroll, Louisiana
Trial Court No. 2019-F-036

Honorable John Clay Hamilton, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Meghan Harwell Bitoun

PENNY WISE DOUCIERE                       Counsel for Appellee
District Attorney

MOLLY M. CLEMENT
AMANDA M. WILKINS
Assistant District Attorneys

* * * * *

Before MOORE, STONE, and MARCOTTE, JJ.

**MOORE, C.J.**

A jury unanimously found Westly X. Freeman guilty as charged for the first degree murder of Chandler Erskine and attempted first degree murder of Mason Bankson.  It acquitted him of two counts of armed robbery of the same two victims.  He was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension sentence for the murder conviction and 50 years' imprisonment at hard labor without benefit of probation, parole, or suspension of sentence for the attempted murder conviction.  The court ordered the sentences to be served consecutively, and expressly stated the grounds that justified consecutive sentences.

Freeman now appeals his conviction alleging three trial errors.

We affirm.

## FACTS

On January 20, 2019, Chandler Erskine asked his 16-year-old friend, Mason Bankston, to drive him to a nearby Sonic Drive-In in rural West Carroll Parish.  Erskine told Bankston that he needed to stop on the way and meet up with someone who owed him twenty dollars.  That "someone" was the defendant, Westley Freeman.  At this time, Freeman and two others, KeJominek Woodruff and James Turner, were riding around in a Kia Soul.  Turner was driving the Soul with the defendant in the front passenger seat and Woodruff in the back seat.  Earlier that day, Turner stopped to pick up two handguns from two of his cousins; they also stopped at a hospital, where Freeman entered and returned with a pair of blue gloves.  About 30 minutes before the offense occurred, the trio stopped at a Chevron gas station.

Bankston's pickup truck and the Kia Soul passed each other on the road; each vehicle turned around, and they met at a location on Arena Road. The defendant, now wearing the blue gloves, got out of the Kia and approached Erskine, who was seated on the passenger side of the truck. As he approached, he fired shots into the vehicle, fatally wounding Erskine.

Bankston jumped out the truck to escape the line of fire. He fell to the ground and attempted to crawl under the truck. Turner got out of the Kia with a gun. The defendant ordered Turner to shoot, and Turner fired his gun at Mason until the magazine was empty.

Woodruff, the backseat passenger in the Kia, testified at trial that he saw Turner shooting at Bankston's leg. Turner and the defendant got back into the Kia and drove away from the scene. They stopped at a lake near Lake Providence, where Woodruff threw a plastic bag in the lake that contained the blue gloves and a cell phone that the defendant removed from Bankston's truck.

Bankston remained under his truck until the Kia drove off. He got back into his truck to call for help, but discovered that both his and Erskine's cell phones were gone. He drove off looking for help and found a man who called 911 and the West Carroll Parish Sheriff's Office. Bankston lost consciousness shortly afterwards.

When police arrived, Erskine was slumped over the console, dead, but Bankston was still breathing with serious injuries. He was airlifted to a hospital in Mississippi. Police were able to backtrack to the scene of the shooting on Arena Road. They discovered two cell phone chargers, tire tracks, and a bloody shoe at the scene.

Bankston described the Kia Soul to police. Ultimately, this led to the arrests of the perpetrators by viewing a surveillance video taken at the Chevron gas station some 30 minutes before the shooting. The video showed the Kia, and Woodruff walking outside of the vehicle. Police were able to identify Woodruff and questioned him. Woodruff named both the defendant and Turner as the shooters.

Turner told investigators that he and the defendant took an AR-style .22 cal. rifle and two cell phones from Bankston's truck. They hid the firearm behind Turner's girlfriend's house, and the rifle was later recovered by the state police.

Subsequently, Freeman was indicted by a West Carroll Parish grand jury and charged with the first degree murder of Chandler Erskine, and the attempted murder of Mason Bankston, and two counts of armed robbery.

After a two-day trial, the jury returned verdicts of guilty as charged to the first degree murder and attempted first degree murder and not guilty to the two counts of armed robbery.

Freeman was sentenced to life without the benefit of probation, parole, or suspension of sentence for the first degree murder of Chandler Erskine, and a consecutive sentence of 50 years for the attempted first degree murder of Mason Bankston.

This appeal followed in which Freeman alleges three assignments of error by the trial court.

**DISCUSSION**

By his first assignment of error, Freeman alleges that the trial court committed legal error by failing to properly follow the three-step inquiry espoused in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d

3

69 (1986). The trial court denied defense counsel's *Batson* objection to the state's peremptory challenge of Mary Hickman, a black prospective juror. Defense counsel contends that the error arose when the trial court postponed its ruling on whether the defense had made a prima facie case of purposeful discrimination before moving to the second step of *Batson*, which requires the state to give its race-neutral reasons for the strike. Freeman argues that the prosecutor's strike of Ms. Hickman, considered in light of the peremptory challenge to Demetrius Williams the day before, exhibited a pattern of discrimination against black jurors, inasmuch as there had only been three potential black jurors from the venire. Freeman alleges that the third step in the court's *Batson* analysis, i.e., weighing the defendant's proof of discriminatory intent against the prosecution's race-neutral reasons, was flawed because the trial judge did not seek the prosecution's race-neutral reason for striking Williams the day before, or the defense's proof of discriminatory intent to weigh against the prosecution's race-neutral reasons. It therefore denied the defense the opportunity to carry its burden of proof of discriminatory intent. It asks the court to remand for a new trial.

The United States Supreme Court has held that the use of peremptory challenges to exclude potential jurors based upon their race violates the Equal Protection Clause. *Batson v. Kentucky*, *supra*; *State v. Nelson*, 10-172 (La. 3/13/12), 85 So. 2d 21. The *Batson* decision is codified in our law in La. C. Cr. P. art. 795.

In *Batson*, the court outlined a three-step test for determining whether a peremptory challenge was based on race. Under *Batson* and its progeny, the opponent of a peremptory strike must first establish a prima facie case of purposeful discrimination. Second, if a prima facie showing is made, the

4

burden shifts to the proponent of the strike to articulate a race-neutral explanation for the challenge. Third, the trial court must then determine if the opponent of the strike has carried the ultimate burden of proving purposeful discrimination. *Batson, supra*; *Nelson*, *supra*.

In the second step of the *Batson* inquiry, the issue is the facial validity of the striking party's offered race-neutral explanation. This reason does not need to be persuasive or even plausible, but must be more than a mere affirmation of good faith. Unless a discriminatory intent is inherent in the striking party's explanation, the reason offered will be deemed race-neutral. *Hernandez v. New York*, 500 U.S. 352, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *Nelson*, *supra*. The burden in step two is one of production, not one of persuasion. *Nelson*, *supra*.

In step three of the *Batson* analysis, the court then evaluates the persuasiveness of the justification proffered by the striking party, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. The proper inquiry in the third stage of the *Batson* analysis is whether the defendant's proof, when weighed against the prosecutor's proffered race-neutral reasons, is sufficient to persuade the trial court that such discriminatory intent is present. *State v. Jacobs,* 99-0991 (La. 5/15/2001), 803 So. 2d 933; *State v. Hobley*, 98-2460, (La. 12/15/99), 752 So. 2d 771, 782. The trial judge's determination of purposeful discrimination rests largely on credibility evaluations, and these findings are entitled to great deference by the reviewing court. *Id.*; *Batson*, 476 U.S. at 99 n. 21, 106 S. Ct. 1712.

Our review of the record shows that on the second day of voir dire, the trial judge released the jury pool for lunch shortly before noon. After the

venire was removed from the courtroom, the judge asked the attorneys if they were ready to make their challenges. The defense peremptorily challenged two members of the venire and exercised a challenge for cause for another. The state then exercised a peremptory challenge to Mary Hickman, a black female prospective juror, and also challenged for cause the same person that the defense had challenged for cause. Defense counsel immediately objected to the prosecutor's peremptory challenge of Ms. Hickman and wanted the prosecutor to state her reason for the challenge.[1]

Defense counsel told the court that he was objecting to the prosecutor's peremptory challenge of Ms. Hickman on the basis of *Batson v. Kentucky, supra.* His sole argument was that the prosecutor's peremptory challenges exhibited a pattern of discrimination against prospective black jurors.

Prior to Ms. Hickman, two prospective black jurors from the venire had been questioned the day before; the state peremptorily challenged one, Demetrius Williams, and accepted the other. Now, on the second day of voir dire, the state peremptorily challenged Ms. Hickman, the third prospective black juror from the venire. Counsel argued that this challenge to Ms. Hickman showed a pattern of strikes against black prospective jurors by the prosecutor. He argued that the prosecutor had now used a peremptory challenge to strike two of the three black potential jurors.

The court expressed reluctance to conclude that the state's challenge to only two black members of the venire constituted a pattern of discrimination. Defense counsel responded that there were very few black

---

[1] The prosecutor deferred stating her reason(s) at that time.

people in the whole jury pool, which was overwhelmingly white. Thus far, only three black members had been examined, and the state used peremptory challenges on two of the three. Without ruling on the defense's argument, the court expressly gave defense counsel the opportunity to bolster its case of discrimination by asking if he could show that there were any statements or any actions by the prosecutor which would indicate purposeful discrimination. Defense counsel said it had nothing more, and that argument was based solely on the prosecution's challenge to two out of the three prospective black jurors. He said: "That's the only thing that I can present to you regarding Step 1, your honor."

The court responded:

> Okay. All right. Well, assuming—and I'm not at this point, assuming that I determine that you have established a prima facia showing by the—a pattern of strikes then the State—do you have an argument with regard to the . . . .

The prosecutor argued that the jury pool accurately reflected the racial makeup of the parish, and that defense counsel had not made a prima facie case of purposeful discrimination. Reluctant to rule on that issue yet, the trial court recessed for lunch, stating that during the lunch break he was going to go back through his notes; before bringing back the venire to the courtroom, the parties would address any additional arguments he felt were needed, and he would then rule on the *Batson* challenge.

When court reconvened, the trial judge returned to the peremptory challenge of Ms. Hickman. While the court expressly told counsel and the prosecutor that it was not yet ready to rule on whether the defendant had carried his burden of making a prima facie case of discrimination, it wanted to hear from the prosecution any race-neutral reasons for the strike.

7

The prosecutor gave several reasons for the challenge to Ms. Hickman. Ms. Hickman was related to several people in the case, including the defendant, the codefendants, and others involved in the case: Ms. Hickman is Freeman's second cousin (i.e., Freeman is the son of her first cousin), she was a cousin of Woodruff, the backseat passenger, and she was the first cousin of Kam Holloway, the person who supplied the murder weapons to Turner. The state said that Ms. Hickman was also related to several other witnesses in the case. The prosecutor also questioned whether Ms. Hickman was credible regarding whether she could find the defendant guilty. She did not believe Ms. Hickman was truthful when she testified on voir dire that she had not discussed the case with anyone in her family. The prosecutor noted all the other prospective jurors admitted that they had discussed the case. Finally, the prosecutor said that Ms. Hickman seemed ambivalent and reluctant in her responses to whether she could vote guilty in the case. She also said that Ms. Hickman tried to approach the assistant district attorney in her office saying that "she was related to [the defendant]," and that she wanted them to know that she had moved to Eudora, Arkansas, the Saturday before trial commenced in order to avoid jury duty.

The court then responded (with emphasis added):

> All right. I spent the lunch hour going back through. With regard to the *Batson* challenge the person challenging the strike has to make a showing of a pattern of strikes by the opposing counsel against members of a suspected class and I'm not at this point persuaded that that showing has been made but in the event that it had, if the explanations that may be made for the challenge which are – need to be unrelated to the impermissible classification the explanation need not rise to the level of a challenge for cause, it just must be plausible. And after reading that I went back through my notes and noted all those things that Ms. Hickman was in advance of this

8

proceeding contacting my office to say "Oh, I'm – don't live here anymore, I live in Arkansas now" which is an indication to me that she had some real hesitation about being involved. I didn't realize that she had also approached the District Attorney's Office. Secondly, I noted that she is kin to most all these folks to some degree that are involved with this case. And so going back through those notes I also noted that she was hesitant with regard to indicating whether she could vote guilty or not, that she was close to Kam and his mother, that her responses to Mr. Johnson's questions were way too quick, she just was giving her response before you even finished asking your questions. Then I noted that we had in yesterday's proceedings there were two black jurors, one of which there was a peremptory challenge on by the State; the second of which was accepted, a Billie Phifer. She knows the defendant, she lived next door to the defendant, she – he lived with his father and she was friends with the defendant's grandmother. She knew a – some Woodruff person, she was very close friends that's involved in this case, that she knew Kam Holloway and she knew Ladarious Ward. She was friends with these boys' mothers. And she only said that she thought she could be fair. I found it strange in that that particular case didn't draw either a peremptory or a challenge for cause, but the State accepted that black juror. And I find that the information that has been presented here and in my notes through the questioning of Ms. Hickman that the reason for the peremptory challenge is not just plausible but it probably would rise to the level of a challenge for cause in my opinion based on the familiar [*sic*] relationship that I just don't think a person that is that closely related to so many people that are involved in this case, it's not reasonable to believe that they could be fair and impartial. And so for that reason **I don't find that there has been a pattern showing strikes against members of the suspected class but if there had been I find that the explanation is more than just plausible, I find it's probably sufficient enough to even justify a challenge for cause.** So with regard to the *Batson* challenge on Ms. Hickman I'm going to deny that challenge.

On review, we initially observe that there was no error by the trial court when it merged steps 1 and 2 in its application of the *Batson* three-step analysis. Both federal and state courts have held that a trial court may "effectively collapse the first two stages of the *Batson* procedure . . . and may then perform the critical third step[.]" *State v. Nelson*, *supra* (although steps 1 and 2 of *Batson* may be merged, step 2 and step 3 cannot be merged

when, in effect, it improperly removes the burden of proof away from the party raising the *Batson* objection to the proponent of the peremptory strike.)

In this instance, the record demonstrates that the purpose of the trial court's delay in ruling on the issue of whether Freeman made a prima facie case of purposeful discrimination was to give defense counsel the benefit of the doubt. On the one hand, the prosecution's exercise of a peremptory challenge to a second prospective black juror hardly constituted a pattern. On the other hand, the court was cognizant that there were very few black members of the venire. So it deferred making a ruling on the defense's prima facie showing. Indicating its reluctance, the court first probed defense counsel for more evidence, asking for any additional evidence (statements, actions, or questions) that might show discriminatory purpose. That failing, and still without ruling whether the defense made a prima facie case, the judge moved forward to the second step of *Batson* to hear if the prosecution's reasons for striking Ms. Hickman were race-neutral.

After hearing the prosecutor's race-neutral grounds, the court indicated that defense counsel had not made a prima facie case of discrimination, as he was "not at this point persuaded that that showing has been made[.]" The court continued, "but in the event it had" and then proceeded with step 3 of *Batson*, in which it concluded that the race-neutral reasons supplied by the prosecutor were credible and actually rose to the level of supporting a challenge for cause.

Instead of rigidly following the *Batson* three-step procedure by ruling after each step, the trial court deferred ruling on the first step before hearing the prosecution's race-neutral reasons. Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has

10

ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot. *State v. Dobbins*, 28,975 (La. App. 2 Cir. 12/11/96), 685 So. 2d 446, quoting *Hernandez v. New York*, *supra* at 500 U.S. at 359, 111 S. Ct. at 1866. Thus, where the court effectively merges steps 1 and step 2 by obtaining the race-neutral reasons for the strike before ruling whether a prima facie case has been made, the latter issue becomes moot, and the court "then may perform the critical third step." *State v. Nelson, supra.* In this instance, the court performed the stage 3 analysis by assuming that a prima facie case was made by the defendant and weighing the prosecutor's race-neutral reasons against it. Finding that the race-neutral reasons were persuasive, it denied the *Batson* challenge.

Freeman also complains that he was denied the opportunity to offer proof of discriminatory intent. We noted above that the trial court expressly invited defense counsel to present any additional evidence of purposeful discrimination including any statements or actions by the prosecution. The defense declined, saying his argument was based solely on a pattern of challenging black jurors that indicated a discriminatory purpose. Additionally, neither side was given another opportunity to argue their position, and neither side raised any objection to the court moving forward with step 3 of its analysis. Defense counsel did object to the ruling.

Freeman also complains that the trial court did not require the state to supply race-neutral reasons regarding the strike of Demetrius Williams. The state exercised a peremptory challenge to Williams, but the defense did not lodge a *Baston* objection to the challenge. Thus, there was no occasion to

11

require the state to supply its race-neutral reasons, nor did counsel object to Williams being excused.

We therefore conclude that the trial court substantially followed the procedure required by *Batson*, *supra*, and we find no error or abuse of discretion by the trial court in denying Freeman's *Batson* objection to the state's peremptory challenge of Mary Hickman.

This assignment is without merit.

By his second and third assignments of error, Freeman alleges that the trial court erred because it admitted hearsay testimony regarding prior bad acts for which no notice was given. Because these two assignments of error concern the same testimony at trial, to avoid repetition, we will consider them together.

*Prior Bad Acts*

The record indicates that, on cross-examination, defense counsel asked a state's witness, Deputy Taylor, how the state had concluded in its opening statement that the defendant had "planned this crime with James Turner." Taylor answered that on the day of the crime, Freeman and Turner stopped at the hospital, and Freeman walked in "to gather some blue gloves." Freeman wore the blue gloves when he shot the victims.

Defense counsel told Deputy Taylor that his answer was not responsive to his question. He said he wanted to know about a plan.

Reading from his report, Taylor then responded that during his second interview, Turner explained to him that the defendant told him "earlier in the day that he wanted to rob a Mark Epting," but Freeman apparently changed his mind and told him to "hit Chandler Erskine up" because he (Freeman) owed Erskine some money.

12

Defense counsel objected to Deputy Taylor's reference to other crimes, wrongs, or acts. Counsel told the court that he was upset over the mention of the name of a party not mentioned in the bill of indictment.

The court responded that it did not hear any other crimes evidence. Counsel responded: "Well, I'm not—I'm not going to ask him to read the name again."

The court agreed to admonish the jury to pay no attention or give any credence to whatever the name was that Deputy Taylor mentioned.

After all of this, Deputy Taylor admitted to defense counsel that these remarks by Turner did not constitute a "plan *per se.*"

On appeal, Freeman now complains that the court's admonition to the jury was not sufficient because there was a reference to prior bad acts in Deputy Taylor's testimony. He argues that the statement attributed to him by Turner and repeated on the witness stand by Deputy Taylor (that Freeman told him he wanted to rob Mark Epting, but he apparently changed his plans) constituted a "prior bad act."

The state argues that defense counsel asked a question to which Deputy Taylor simply responded; the state did not plan to introduce testimony of prior crimes or bad acts, and it did not pursue the matter with follow-up questions. Therefore, the law regarding prior notice to the defendant does not apply since the state could not know what Deputy Taylor was going to say in response to defense counsel's question. It was defense counsel who "opened the door" to Deputy Taylor's responses regarding why he thought Freeman had a plan or planned to kill or rob the victims.

On review, we initially conclude that a reasonable interpretation of the trial transcript regarding this matter indicates that Deputy Taylor interpreted

defense counsel's question about a "plan" or "planned" as referring to Freeman's preparation or that he intended to commit the offense, and not in the sense creating a scheme or method of acting.  E.g., "I plan to go to church Sunday," versus "I made a plan to get out of debt."  Hence, Deputy Taylor's initial answer to the question regarding what evidence indicated that Freeman planned to commit the crime was responsive and appropriate. The fact that Freeman stopped at a hospital to pick up blue gloves is evidence that he planned (intended) to use his gun to commit the offense.

Freeman argues that the state cannot avail itself of the argument that defense counsel "opened the door" to the response by its questioning because that doctrine is unavailable when a witness is being nonresponsive to the question being asked.  Not only do we find this doctrine inapplicable to this case, since Deputy Taylor's answers were indeed responsive to the questions asked, we also find that the two cases cited by the defendant are inapposite.  In *State v. Davis,* 351 So. 2d 771 (La. 1977), the supreme court held that defense counsel did not open the door for further questions by the state on redirect regarding the witness's lie detector test where the witness mentioned that she had been taken to have a lie detector test.  Her answer was unresponsive to defense counsel's question regarding what time she went to work on the day after the robbery.

In *Davis*, the trial court permitted the state to pursue questioning the witness regarding the test.  By contrast, in the instant case, there were no further questions regarding Turner's statement to Deputy Taylor.

In *State v. Jackson,* 98-227 (La. App. 3 Cir. 2/3/99), 734 So. 2d 658, the prosecution exploited the mention of a prior bad act in response to a question on cross-examination by defense counsel.  The trial court allowed

14

the state to ask further questions about the arrest on redirect and introduce documents about the arrest over the defense objections. Again, these facts are not similar to the instant case where the state made no attempt to exploit mention of Mark Epting or the defendant's discarded "plan" to rob him.

Finally, the defense contends that the implication of Deputy Taylor's testimony relative to Freeman's having a plan to rob someone before meeting up with Chandler Erskine was profoundly prejudicial. He alleges that the state argued at trial that Freeman had planned to commit this crime, but no witnesses could corroborate that there was such a plan. He maintains that the reference to another "planned" robbery was highly prejudicial.

Aside from again playing on the ambiguity of "plan" or "planned" in this argument, we conclude that the overwhelming evidence against the defendant regarding the instant crimes surely had only a minuscule effect, if any, on the jury's verdict. Accordingly, we find no merit to the argument the defendant was "highly prejudiced" by the deputy's hearsay statement that Freeman said he wanted to rob a certain person (unrelated to the instant offense) but he apparently changed his mind.

Moreover, the court correctly did not admonish the jury regarding the alleged prior bad act. We agree with the trial court that the desire to rob someone is not a crime, nor is it a prior bad act. It is simply the desire to commit a bad act.

*Hearsay*

Freeman also complains that the same statement by Deputy Taylor regarding the alleged prior bad act was inadmissible hearsay and therefore deprived him of the right to confront the witness.

15

The trial transcript does not show that Freeman raised a hearsay objection at trial regarding this statement. The general rule is that when no contemporaneous objection is made and ruled upon by the trial court, the defendant cannot complain on appeal. La. C. Cr. P. art. 841.

Nevertheless, even if the statement was hearsay, defense counsel had the right to confront Turner, who was not only a codefendant, but also was a state's witness at the Freeman's trial. Although Turner was cross-examined by the defense prior to Deputy Taylor's testimony, defense counsel was supplied a copy of the report that contained the statement which Deputy Taylor read in court that contained the reference to Mark Epting. In fact, defense counsel bragged that he had read the report many, many times searching for evidence of a plan by the defendant, but could not find one.

Finally, Freeman has not shown that he was actually prejudiced by the statement made by Deputy Taylor. The erroneous introduction of other crimes evidence is subject to harmless error review, and the admission will be deemed harmless if the verdict is surely unattributable to the error. *State v. Fisher*, 46,977 (La. App. 2 Cir. 2/29/12), 87 So. 3d 189.

These assignments are without merit.

## CONCLUSION

For the foregoing reasons, the defendant's convictions and sentences are affirmed.

**CONVICTIONS AND SENTENCES AFFIRMED.**